697 A.2d 478

**DEPARTMENT OF LABOR, LICENSING AND REGULATION**

v.

**Nancy S. FOX.**

No. 95 Sept. Term, 1996.

Court of Appeals of Maryland.

July 30, 1997.

Andrew Auerbach, Assistant Attorney General (Joseph J. Curran, Jr., Attorney General; Lynn M. Weiskittel, Assistant Attorney General, on brief), Baltimore, for Appellant.

Lynn A. Davenport (Russell A. Hollrah, Littler, Mendelson, Fastiff, Tichy & Mathiason, P.C., on brief), Washington, DC, for Appellee.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, RAKER and WILNER, JJ.

RODOWSKY, Judge.

This appeal involves liability for unemployment insurance taxes under Maryland Code (1991), § 8–607 of the Labor and Employment Article (LE).[1] The appellant, Department of Labor, Licensing and Regulation (the Department), contends that persons placed in temporary jobs at dentists' offices by

---

1. Unless otherwise indicated all statutory references are to Md.Code (1991) Labor and Employment Article.

the appellee are employees of the appellee for unemployment insurance tax purposes. The appellee, Nancy S. Fox (Fox), denies liability for the tax, maintaining that the temporary workers are independent contractors who are not engaged in covered employment. On judicial review of the Department's determination that the workers were covered employees, the Circuit Court for Carroll County held that they were independent contractors. Prior to consideration of the Department's appeal by the Court of Special Appeals, this Court granted certiorari on its own motion. We shall reverse the circuit court for the reasons set forth herein.

## I

Because the decision of this case is governed by statutory rules, and not by common law principles relating to master and servant, we first present the relevant statutes. During the period involved here, any "employing unit" must pay unemployment insurance contributions on the first $7,000 of annual taxable wages for "covered employment" performed for the employing unit. § 8–607. Section 8–201 defines the scope of covered employment in relevant part as follows:

"Except as otherwise provided in this subtitle, employment is covered employment if:

(1) regardless of whether the employment is based on the common law relation of master and servant, the employment is performed:

(i) for wages; or

(ii) under a contract of hire that is written or oral or express or implied . . . ."

Subject to exceptions not here relevant, the term " '[w]ages' means all compensation for personal services . . . ." § 8–101(v)(1).

■ Under § 8–201 proof by the Department of employment for wages or under a contract of hire creates a presumption of covered employment, and the burden is upon the employer to demonstrate an exemption from covered employment. *Blue Bird Cab Co. v. Maryland Dep't of Employment*

*Sec.,* 251 Md. 458, 464, 248 A.2d 331, 334 (1968); *Department of Employment Sec. v. Charlie's Barber Shop,* 230 Md. 470, 475, 187 A.2d 695, 698 (1963); and *Warren v. Board of Appeals,* 226 Md. 1, 16–17, 172 A.2d 124, 131 (1961). *See also* Md. Regs.Code tit. 09, § 32.01.18A (1973) (COMAR).

One of the exceptions to "covered employment" is § 8–205, "Independent contractors." That section reads:

"Work that an individual performs under any contract of hire is not covered employment if the Secretary is satisfied that:

(1) the individual who performs the work is free from control and direction over its performance both in fact and under the contract;

(2) the individual customarily is engaged in an independent business or occupation of the same nature as that involved in the work; and

(3) the work is:

(i) outside of the usual course of business of the person for whom the work is performed; or

(ii) performed outside of any place of business of the person for whom the work is performed."

■ The burden is on the employer to persuade the Secretary of the Department that each of the conjunctively stated elements of the exemption has been satisfied. *Blue Bird Cab,* 251 Md. at 464–65, 248 A.2d at 334; *Charlie's Barber Shop,* 230 Md. at 475, 187 A.2d at 697–98; *Warren,* 226 Md. at 16–17, 172 A.2d at 131.

## II

Fox is a sole proprietor who trades as "Dental Placements." She furnishes temporary help exclusively to dentists' offices in the greater Baltimore metropolitan area. Principally Fox refers hygienists and dental assistants, but she also occasionally refers dentists and dental secretaries.

Fox maintains a registry of those persons qualified, and, where required, licensed to render the four types of services

described above. Persons interested in work at a dental office on a temporary basis through referral by Fox complete a questionnaire describing their skills, licensing, education, references, and availability. Fox verifies the information furnished by the applicant. If Fox is satisfied to include the prospective worker on Dental Placements' registry, the worker must sign a contract headed, "Subcontractor Agreement," under which the applicant agrees to specified conditions. They are:

1. "To acquire any malpractice insurance necessary to the performance" of the applicant's duties in a dental office to which the applicant is referred;

2. "To accept any placement assigned by Dental Placements in the capacity of an Independent Contractor ...";

3. "To be compensated for [the applicant's] services in accordance with the current fee schedule available upon request from Dental Placements, at the completion of [the applicant's] placement assignment ..."; and

4. Not to accept permanent placement offered or found as a result of temporary assignment arranged by Dental Placements until the prospective employer has paid Fox a placement fee.

Dentists who wish to avail themselves of the services of Dental Placements also sign a written contract, labeled "Policy Statement" or "Policy Contract." It specifies the fees to be paid by the dentists to Fox for various types of temporary placement. These fees are payable upon receipt of Fox's invoice by the dentist. Included in the agreement is the dentist's promise to pay a cancellation fee for any cancellation after confirmation of a temporary placement and a higher cancellation fee for cancellation on the day for which the temporary work was scheduled. Participating dentists also agree to pay Fox a fee if the temporary work results in a permanent placement. As of February 15, 1992, that fee was $1,075 for a hygienist who had worked for the hiring dentist for thirty hours or more in the preceding twelve months.

At the time of the agency evidentiary hearing, the fee paid to Fox by a dentist for the services of a hygienist for a full day was $209, and under her then fee schedule Fox would pay the hygienist $155. Fox unilaterally determines the amount of fee that she will pay to the workers. She testified that if a hygienist was not satisfied with the scheduled amount to be paid, the hygienist "can go on her merry way."

If a dental office is dissatisfied with a temporary worker, it is the dentist, and not Fox, who has the authority to remove that individual from the temporary position. She furnishes no tools to the workers. Further, Fox holds no license in the dental services field and does not hold herself out as qualified to perform any services in that field for which no license is required. She is an administrator. To the extent that the workers are directed how to perform their services while on a temporary job, the direction is given by persons at the particular dentist's office.

In July 1992 a field auditor employed by the State of Maryland audited Dental Placements' records from 1990 forward and concluded that the workers were engaged in covered employment for Fox. Fox was unsuccessful in first level, intra-agency review. She administratively appealed, and an evidentiary hearing was held December 14, 1993, before a special examiner of the Department of Economic and Employment Development.[2]

The special examiner found that Fox exercised "more than minimal control" over the workers because she determined "what individuals would be referred to each appropriate dentist/dental clinic" and determined on a "take it or leave it" basis the specific fee to be paid to the worker for that person's services. The special examiner noted that Fox decided who would be placed on the registry, and he also relied on the

2. A 1995 reorganization substituted the appellant for the Department of Economic and Employment Development with respect to responsibilities for unemployment compensation insurance. *See* Chapter 120 of the Acts of 1995.

provisions of the contract for hire that dealt with permanent placement.

With respect to the second element that Fox was required to prove under § 8–205(2), the special examiner concluded:

"There was no evidence presented by the employer to support [her] contention that any or all of the individuals listed in the Agency's audit were customarily engaged in an independently established occupation or business of the same nature as that involved in the service in question during the calendar years 1990, 1991 and 1992."

With respect to the third element of § 8–205, the special examiner found that "all such work was performed outside of any place of business owned by [Fox]."

The special examiner concluded that, with the exception of seven persons not here involved, the individuals listed in the agency's audit of Fox for 1990, 1991, and 1992 were engaged in covered employment.[3]

The Board of Appeals of the Department of Economic and Employment Development (the Board) adopted the findings of facts and conclusions of law of the special examiner and affirmed the examiner's decision. On Fox's petition for judicial review the Circuit Court for Carroll County reversed for the reasons stated in a written opinion.[4]

The heart of the circuit court's rationale was as follows:

---

3. The special examiner held that seven workers involved in the audit were independent contractors, based on a factor unique to those seven persons. There is no issue before us concerning those seven persons, and we intimate no opinion on that aspect of the agency's ruling.

4. The circuit court concluded "that 'reasoning minds' could, and likely would, differ as to the conclusion of the hearing examiner...." If the circuit court meant that some "reasoning minds" would agree with the special examiner's conclusion, while others would not, then the special examiner's conclusion was fairly debatable, and the circuit court should have affirmed. The circuit court is not free to substitute its judgment for that of the agency if the matter is fairly debatable. If the circuit court meant that no reasonable person could have reached the decision reached by the special examiner and affirmed by the Board, then we disagree with the circuit court.

"In this case, Fox does not control the work procedures or standards of the professionals. Fox provides nothing to the dental professionals except the opportunity to take a job placement. The dental professionals who need licenses or special education, get those items themselves. The professionals obtain their own insurance, uniforms and instruments, when needed. The professionals need not ever go to Fox's office. No work is performed at Fox's office. Fox cannot 'fire' the dental professionals. They are contracted to perform work for a dental office. Only the dental office can fire the professional. The Board argues that because Fox has the power to decide who gets which placements, she controls these professionals. This does not make any sense to the Court because the professional decides whether or not to take a job and the dental office themselves tell the professionals how they want a job performed. Fox has no control over these professionals and their performance of their duties for the dental offices."

## III

■ The scope of judicial review of a determination by the Board in an unemployment insurance tax case is set forth in § 8–512(d).

"In a judicial proceeding under this section, findings of fact of the Board of Appeals are conclusive and the jurisdiction of the court is confined to questions of law if:

(1) findings of fact are supported by evidence that is competent, material, and substantial in view of the entire record; and

(2) there is no fraud."

In *Baltimore Lutheran High School v. Employment Sec. Admin.*, 302 Md. 649, 490 A.2d 701 (1985), we considered substantially the same statute in an earlier form and concluded that ordinarily the reviewing court "shall determine (1) the legality of the decision and (2) whether there was substantial evidence from the record as a whole to support the decision." *Id.* at 662, 490 A.2d at 708.

## IV

■ Here, the circuit court concentrated its analysis on matters of control over the details of the work as well as on the right to hire and, particularly, to fire. In so doing the circuit court paid little heed to the direction of § 8-201(1) under which there is a presumption of covered employment "regardless of whether the employment is based on the common law relation of master and servant."

Prior decisions of this Court forcefully illustrate the difference between covered employment and a common law master-servant relationship. In *Department of Employment Sec. v. Charlie's Barber Shop,* 230 Md. 470, 187 A.2d 695, a "master barber" who owned and operated a barbershop in Ocean City leased chairs in his shop to other barbers. Each lessee paid the barber a fixed weekly sum for use of a chair along with $5 per week for tonics and linens. *Id.* at 473, 187 A.2d at 696. The terms of the lease also stipulated that each lessee had use of his chair during normal working hours but was under no compulsion to report to work; was free to set his own prices (although all of the barbers' prices were uniform); kept all fees and tips without accounting to the shop owner; had his own key to the shop, his name posted behind his chair, his own price list posted, and his own business cards; furnished his own tools; and paid self-employed social security tax. *Id.* at 473, 187 A.2d at 696–97. The lessees did not list themselves as individual barbers in the telephone directory. *Id.* at 473, 187 A.2d at 696.

The agency's finding that the lessees were engaged in covered employment was reversed by the circuit court. *Id.* at 472, 187 A.2d at 696. This Court reinstated the agency's decision, holding that there was substantial evidence that the lessees were not free from control, based largely on a "working in harmony" clause in the leases. We said:

"As to freedom of control or direction, it appears that [the master barber] could not tell the other barbers how to provide services for a customer, nor could he control their working hours. It also appears that the contract of lease

could not be broken by [the master barber] if he no longer wished to have one of the [lessees] work in the shop, except for the clause that states they must work 'in harmony' with the others. It would be unrealistic to believe that he could not 'fire' one of the barbers if he found it necessary to do so in order to protect the business patrons of the shop, particularly in the face of no applicable standards of what is to constitute 'harmony.' ... We feel that there is not the absence of control or direction so as to satisfy [the statutory predecessor of § 8–205(a) ]. Although [the master barber] may not have had the full freedom to terminate the employment relationship as is usually found in such cases, he did have such power as to amount to constructive control."
*Id.* at 475–76, 187 A.2d at 698.

In *Blue Bird Cab Co. v. Maryland Dep't of Employment Sec.*, 251 Md. 458, 248 A.2d 331, we addressed the issue of whether drivers who operated taxicabs owned by a taxicab company were employees of the company for unemployment insurance tax purposes. Blue Bird Cab Company (Blue Bird) owned seventy-four cabs bearing its name and leased them to holders of valid chauffeurs' licenses. *Id.* at 460–61, 248 A.2d at 332. According to the terms of the lease, drivers paid a flat fee to Blue Bird. They purchased gasoline at their cost wherever they chose. Drivers could use the cabs for personal use and take them out of state. *Id.* at 461, 248 A.2d at 333. Although a driver was required by law to keep a daily manifest, Blue Bird received no part of the drivers' fares or tips and required no financial reports from the drivers. *Id.* at 462, 248 A.2d at 333. A dispatcher located at Blue Bird's central office used a two-way radio system to inform drivers of calls for cabs, but drivers were not required to undertake the fare. *Id.* at 461, 248 A.2d at 332. Blue Bird provided all maintenance for the automobiles. *Id.* at 461, 248 A.2d at 333. The agency found that the drivers were engaged in covered employment, and the circuit court affirmed. *Id.* at 459–60, 248 A.2d at 332.

On appeal, this Court affirmed. We focused on the specifics of the lease arrangement under which the drivers agreed " 'to

obey the operating rules of the Owner, ... covering general minimum standards of operation and cleanliness,' " and on the drivers' agreement not to " 'sublet or allow any other party to use said leased equipment.' " *Id.* at 465, 248 A.2d at 335. The drivers further agreed to " 'reimburse Lessor on return of the equipment to Lessor for any breakage, shortage, or damage to said leased equipment.' " *Id.* We held that these lease provisions provided Blue Bird with enough control over the drivers to exclude the drivers from being treated as independent contractors. *Id.*

Here, there was substantial evidence that the workers were not free from control by Fox with the result that Fox failed to satisfy the requirement for exemption set forth in § 8–205(1). We base our holding on the following facts.

Dental Placements is not a mere referral or brokering service which matches the needs for staffing of dentists' offices with the availability of independent contractors. Under the Dental Placements' system of doing business there is an express contract between Fox and a dentist and a separate express contract between Fox and the worker. The fee paid by the dentist to Fox covers both Fox's service in matching need with help and the wages to the worker.[5] Thus, this case is stronger for control by Fox than the two cases reviewed above. In *Charlie's Barber Shop* the master barber did not pay the lessees, and in *Blue Bird Cab* the taxicab company did not pay the drivers. Fox, however, pays the temporary workers directly. Further, when choosing between equally qualified and available workers to offer a referral, Fox determines who will work and be paid and who will not work or be paid that day. *See, e.g., State v. Medical Placement Servs.,* 457 A.2d 382, 386 (Del.Super.Ct.1982) (referral agency which "employs its own discretion in pairing [temporary workers] with their respective assignments" held liable for unemploy-

---

**5.** Although the dentist exercises control over the performance of the work, there are no "wages" paid by the dentist directly to the worker, and there is no "contract of hire" directly between the dentist and the worker, at least when the temporary employment is first confirmed.

ment insurance contributions). Just as it was "unrealistic" in *Charlie's Barber Shop* to consider that Charlie would not use the "harmony" clause to terminate the lease of a troublesome lessee, so it is unrealistic to think that Fox would not take advantage of the absence of any fixed term in the Fox-worker contract to discontinue offering referrals to a worker about whom dentists had complained.

Fox's "no negotiation" policy with respect to the wages that she pays to the workers is more consistent with an employer's effort to avoid employee discontent over disparities in compensation for similar work than it is with the workers' having independent contractor status. Independent contractors, in offering their services for sale, will ordinarily quote a price for the services to the offeree, or specify a method for determining the cost to the offeree of the services.

Also indicative of Fox's control over the services of the workers is the provision in the Fox-dentist contract for the payment of a "placement fee" by the dentist before a worker may accept permanent employment after a temporary assignment. Indeed, Fox reasserts this effort at control by providing in the Fox-worker contract that that worker may not undertake offered permanent employment until the dentist has paid the placement fee to Fox. *In re David Gentile Nursing Servs., P.C.,* 65 N.Y.2d 622, 491 N.Y.S.2d 156, 480 N.E.2d 745 (1985), *rev'g & adopting dissent in In re David Gentile Nursing Servs., P.C.,* 106 A.D.2d 763, 483 N.Y.S.2d 796, 798 (1984), held that a nursing referral service's policy of forbidding nurses from accepting employment with a client for ninety days following termination of affiliation with the referral service constituted "active employer direction and control ... [and] is symptomatic of an employer-employee relationship."

Further support for the examiner's findings lies in the treatment of cancellation fees under Dental Placements' system. If a dentist cancels after Fox has confirmed that she will furnish the temporary help requested by the dentist, the dentist is contractually obliged to pay Fox a cancellation fee of

$40 ($65 if the cancellation is on the scheduled day). No part of this fee is paid to the worker who had agreed with Fox to take the assignment. This system is inconsistent with Fox's theory that she merely refers independent contractors to the dentists. If the latter were the case, the dentist's unexcused breach would be of a contract between the dentist and the worker. The Dental Placements' system, however, treats Fox as if she controlled the services of the workers.

Similarly, the contract between Fox and the worker provides that Fox will compensate the worker for the services rendered at the completion of the placement assignment. There is no provision excusing this payment obligation on the part of Fox in the event that the dentist does not pay Fox. On the face of the contract, the risk of loss based on the extension of credit in performing services before payment is on Fox. If, as Fox contends, she merely refers independent contractors to dentists, the risk of loss by non-payment should be on the worker. *See, e.g., Claims of Rinaldi,* 281 A.D. 1051, 121 N.Y.S.2d 155 (N.Y.App.Div.1953) (workers who were paid by referral service even when client failed to pay referral service held to be covered employees).

Fox alternatively urges us to adopt the common law approach to the employer-employee relationship taken by the Internal Revenue Service (IRS). Section 8-103 states that, absent a clear indication of an intent to the contrary, the applicable portions of the Maryland Code addressing unemployment compensation are to be "construed in a manner consistent with the relevant provisions of the Internal Revenue Code." IRS guidelines pertaining to this issue as set out in the U.S. Treasury Department's Revenue Rulings include a multi-factor test and three hypothetical "situations" for determining the employment status of workers. Rev. Rul. 87-41, 1987-1 C.B. 296-301. Fox argues that her relationship with the workers satisfies the independent contractor criteria used by the IRS and directly parallels one of the IRS "situations" in which a hypothetical referral firm was deemed, for employment tax purposes, to have no employment relationship with the workers it places. *Id.* at 297-98, 301.

Moreover, Fox points to *In re Serino,* 190 B.R. 778 (Bankr. M.D.Pa.1995), to support her claim that the federal standards mandate a finding that the workers are independent contractors and not her employees. There, the court considered whether Serino, the sole proprietor of a referral firm which maintained a registry of nurses for assignments, was liable for employment taxes. Serino referred registered nurses, licensed practical nurses, and nurse aides to patients located in hospitals, nursing homes, and private homes. *Id.* at 780–81. The business operated much like Dental Placements.

Ruling on an objection by the IRS to Serino's bankruptcy plan, the court held that Serino "was no more than a matchmaker between nurse and patient with compensation" and that "the right to control factors weigh heavily in favor of independent contractor status . . . [such] that [Serino] is not responsible for the withholding taxes in question." *Id.* at 782, 784.

In the instant case, the examiner agreed to admit the IRS "factor control test" into evidence, but he cautioned Fox to "remember I'm here to interpret the unemployment charge law and not the IRS requirements. . . . I really don't see the relevance of [the IRS criteria]." We agree. According to § 8–201, employment for wages or under a contract of hire is presumed to be covered employment for unemployment tax purposes "regardless of whether the employment is based on the common law relation of master and servant." For employment taxes the IRS uses "the usual common law rules applicable in determining the employer-employee relationship." 26 U.S.C. §§ 3121(d)(2) and 3306(i); 26 C.F.R. § 31.3121(d)–1(c) (1992); *Dillon v. Commissioner,* 902 F.2d 406, 408 (5th Cir. 1990); *Mladinich v. United States,* 379 F.Supp. 117, 118 (S.D.Miss.1974). As explained *infra,* the Maryland unemployment insurance definition of "covered employment" is broader than that of the common law. *See, e.g., Charlie's Barber Shop,* 230 Md. at 475, 187 A.2d at 698; *Warren,* 226 Md. at 17, 172 A.2d at 131. The *Serino* opinion, therefore, is not on point.

We hold that Fox's relationship with her workers does not meet the first element required for exception from covered employment for an independent contractor arrangement.

V

■ The Board also affirmed the hearing examiner's finding that Fox had failed to prove the independent business element required by § 8-205(2) for the independent contractor exemption. Rejecting the agency's alternate ground of decision, the circuit court concluded that "[b]y the nature of the business in that these professionals must provide their own education, licenses, uniforms, insurance, etc., these professionals are customarily engaged in an independent occupation." COMAR 09.32.01.18B(3)(c) lists ten factors to consider in evaluating whether the person performing the service is customarily engaged in an independent business. Reference to these factors demonstrates that there was substantial evidence to support the agency's position on the independent business element as well.

· *(i) Maintains a business listing in the telephone directory.*

At the hearing, the examiner specifically asked, "[W]hat evidence can you give me today, business cards, stationary, invoices, yellow pages listings, that these people are in business for themselves? What do you have?" Fox was unable to provide any such evidence.

· *(ii) Has his or her own place of business.*

Fox argues that the workers would logically need their own place of business to use as a contact point for referral agencies and the clients. A telephone in a home can hardly be said to constitute one's "own place of business," and, more important, Fox offered no evidence during the hearing before the examiner that any of her workers have their own place of business.

· *(iii) Has a financial investment in a related business and can incur a loss in the performance of the service.*

There was no evidence that any of the workers had invested capital that might be lost in performing services on referral by Fox.

· *(iv) Has his or her own equipment needed to perform the service.*

Fox testified that "[s]ome" of the dental hygienists supply their own equipment and that "[s]ometimes" dentists will bring their own tools with them to an assignment. She did not, however, disagree with the suggestion that "generally speaking" the dentists for whom the service was performed provided all the tools. Nor did Fox make any specific showing as to how often the workers she refers supply their own equipment.

·*(v) Determines the price of the service to be performed.*

As discussed in Part IV, *supra,* Fox does not satisfy this factor.

· *(vi) Employs others to perform this service.*

Fox testified that a worker was not permitted to hire another person to perform a temporary assignment. She stated that if a worker received an assignment from Dental Placements but subsequently received a more lucrative offer from another referral service, the worker's only option was to forsake Fox's assignment because Fox would not allow any substitutions.

· *(vii) Carries his or her own liability or workers' compensation insurance, or both.*

Under the "Subcontractor Agreement," a temporary worker agrees "[t]o acquire any malpractice insurance necessary to the performance of my duties." Fox testified that she required "the two dentists that work with us" to maintain their own malpractice insurance. Otherwise, Fox offered no evidence that the workers carried their own liability and/or workers' compensation insurance.

· *(viii) Performs the service for more than one unrelated employer at the same time.*

As is the nature of temporary employment, the workers were free to accept job referrals from other agencies in addition to those from Dental Placements. Fox's accountant testified that some of the hygienists work full time four days a

week and accept temporary assignments from Fox on their day off. In response to the examiner's request for some proof of the claim that the workers maintain other, related employment, Fox could not provide any such evidence.

In *Blue Bird Cab,* we held that taxicab drivers "were not engaged in an independently established trade, occupation, or business of the same nature," as that of the cab company, 251 Md. at 465, 248 A.2d at 335, despite the fact that the drivers "may, and frequently do" work for other cab companies in addition to Blue Bird. *Id.* at 462, 248 A.2d at 333. It was enough, we concluded, that services were performed in the usual course of Blue Bird's business and that drivers were alerted to potential passengers through radio communications. *Id.* at 465–66, 248 A.2d at 335. *See also Charlie's Barber Shop,* 230 Md. at 476, 187 A.2d at 698 (employer offered "no evidence to indicate that any one of the barbers was engaged in an independently established business" even though lessees had no duty to report to work); *State v. Medical Placement Servs.,* 457 A.2d 382, 386–87 n. 6 (Del.Super.Ct.1982) (fact that temporary health care personnel "worked for a patchwork of other agencies and placement services in addition to their parttime employment with [appellee-referral firm]" did not mean workers were independent contractors); *Yurs v. Director of Labor,* 94 Ill.App. 2d 96, 235 N.E.2d 871 (1968) (funeral home organist who also performed at weddings, receptions, and church services was not engaged in independently established trade where mortician set organist's fee and paid organist whether or not mortician received payment from customers and there was no evidence of professional listings or advertisements of her services).

· *(ix) Sets his or her own hours.*

Fox maintains that the right to refuse to accept an assignment is akin to the ability to set the hours of employment. We see no correlation between the two. Fox testified that when a client contacts Dental Placements seeking a temporary referral, it is the dental office, rather than the temporary worker, who dictates the required hours of employment. In

any employment relationship a job applicant may refuse a position because of the number of hours required by the employer, and such a right is not dispositive of independent contractor status. *See, e.g., Charlie's Barber Shop,* 230 Md. at 473, 187 A.2d at 696 (lessee barbers were covered employees despite having no duty to report for work); *Blue Bird Cab,* 251 Md. at 461, 248 A.2d at 332 (cab drivers were employees even though they had the option to refuse to take a call for a potential customer).

· *(x) Is paid by the job.*

Fox paid the workers on completion of their assignments. This is indicative of an independent contractor. *See, e.g., North Face Exteriors, Inc. v. Commissioner,* 457 N.W.2d 778, 781 (Minn.Ct.App.1990) (independent contractor receives payment according to individual task rather than by the hour).

As demonstrated by the above review, there was substantial evidence to support the examiner's finding that the workers were not customarily engaged in an independent business or occupation of the same nature as that involved in the dental referral assignments.

## VI

Failure of a taxpayer to satisfy the agency on any one of the three elements that must be proved for exemption from covered employment on the independent contractor basis results in covered employment. Here, the agency found that Fox failed to prove two of the three elements, and there was substantial evidence to support that finding as to each of those two elements. Accordingly, the decision of the agency should have been affirmed.

JUDGMENT OF THE CIRCUIT COURT FOR CARROLL COUNTY REVERSED. CASE REMANDED TO THAT COURT FOR THE ENTRY OF A JUDGMENT AFFIRMING THE DECISION OF THE BOARD OF APPEALS OF THE MARYLAND DEPARTMENT OF ECONOMIC AND EMPLOYMENT DEVELOPMENT. COSTS TO BE PAID BY THE APPELLEE.