56 Mass. App. Ct. 473 (2002)     473

Boston Bicycle Couriers, Inc. *v.* Deputy Director of the Division of Employment and Training.

BOSTON BICYCLE COURIERS, INC. *vs.* DEPUTY DIRECTOR OF
THE DIVISION OF EMPLOYMENT AND TRAINING & another.[1]

No. 99-P-1433.

Suffolk. August 29, 2001. - November 18, 2002.

Present: LAURENCE, MASON, & BERRY, JJ.

*Employment Security,* Employment relationship, Exemption, Judicial review.
*Administrative Law,* Substantial evidence.

Discussion of the legal framework for the so-called independent contractor
exemption from contributions to the State unemployment compensation
fund under G. L. c. 151A in connection with wages paid to employees.
[476-481]

Substantial evidence supported a determination by a board of review of the
Department of Employment and Training that a bicycle courier company
had not satisfied the statutory requirements for establishing that it was
entitled to the independent contractor exemption from contributions to the
unemployment compensation fund under G. L. c. 151A, on behalf of a
delivery courier working for it, where there was no showing by the
company that the courier was engaged in providing services of the same
nature in a freestanding, independent business enterprise in which the
courier had a proprietary interest. [481-485]

CIVIL ACTION commenced in the Boston Municipal Court
Department on November 14, 1997.

The case was considered by *Annette Forde,* J.

*Susan Paulson,* Assistant Attorney General, for Deputy Direc-
tor of the Division of Employment and Training.

*Michael B. Cosentino* for the plaintiff.

BERRY, J. This case concerns the liability of Boston Bicycle
Couriers, Inc. (BBC), for contributions to the State unemploy-
ment compensation fund under G. L. c. 151A, the Massachusetts
Employment and Training Law (Act). See G. L. c. 151A, §§ 13-
14. BBC contends that it was exempt from contributions to the

---

[1]Anthony DiMare.

474            56 Mass. App. Ct. 473 (2002)

Boston Bicycle Couriers, Inc. *v.* Deputy Director of the Division of Employment and Training.

fund because delivery couriers working for BBC, such as Anthony DiMare (the claimant for unemployment benefits in this case), were independent contractors. Therefore, BBC asserts the company fell within the independent contractor exemption set forth in G. L. c. 151A, § 2.[2,3]

1. *Procedural and factual background.* The case began when DiMare, a courier, left his position at BBC and applied to the Division of Employment and Training (DET) for unemployment benefits. While this unemployment application was pending, the DET status department, acting on its own motion, commenced an investigation of BBC. See G. L. c. 151A, § 12. The purpose of the DET investigation was to reach a status determination concerning whether BBC was subject to the Act's provisions for mandatory contributions to the unemployment compensation fund in connection with wages paid to employees.

Following proceedings at several levels of administrative review, a board of review (board) of the DET determined that

[2]General Laws c. 151A, § 2, as amended by St. 1990, c. 177, § 250, provides, as herein relevant, that

> "[s]ervice performed by an individual . . . shall be deemed to be employment subject to this chapter irrespective of whether the common-law relationship of master and servant exists, unless and until it is shown to the satisfaction of the commissioner that —
>
> (a) such individual has been and will continue to be free from control and direction in connection with the performance of such services, both under his contract for the performance of service and in fact; and
>
> (b) such service is performed either outside the usual course of the business for which the service is performed or is performed outside of all the places of business of the enterprise for which the service is performed; and
>
> (c) such individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed."

[3]The independent contractor exemption, which implicates the financial responsibilities of an employing unit under the Act, has been the subject of extensive analysis in the case law of other jurisdictions with similar unemployment compensation statutes. (See case references and authorities, *infra.*) The exemption, however, has not been the subject of such substantive review and analysis in Massachusetts precedent.

BBC had not met its burden of proof on the tripartite elements of the independent contractor exception in § 2.[4] The board, accordingly, held that "the services performed by the claimant [DiMare], as well as others performing services in similar circumstances, are deemed to be in employment," and subject to the Act. By this status determination, BBC, among other requirements, would be responsible for contributions to the unemployment compensation fund based on the wages BBC paid to the couriers.[5] BBC filed an appeal with the Boston Municipal Court.[6] See G. L. c. 151A, § 42. A judge of that

[4]The procedural history of the administrative proceedings may be summarized as follows. Upon conclusion of its investigation, the Division of Employment and Training (DET) status determination section determined that the services DiMare performed as a driver for BBC constituted employment subject to the provisions of the Act. BBC then requested a hearing to challenge this status determination. See G. L. c. 151A, §§ 12, 39(*b*). Following that hearing, the DET review examiner (who was the deputy director) overturned the determination of the status department and held that the terms and conditions of DiMare's work rendered him an independent contractor. The next procedural step involved further review before the DET board of review. See G. L. c. 151A, § 40. Following the allowance of an application for such review, the board remanded the case to the deputy director to make further subsidiary findings of fact in response to specific questions posed by the board. Thereafter, the board adopted these consolidated findings. However, the board concluded that the review examiner's legal determination that DiMare was an independent contractor was not supported by the facts found and constituted error of law, and held that BBC had not met the § 2 exemption and was subject to the Act. BBC's appeal to the Boston Municipal Court under G. L. c. 30A followed.

[5]In addition, BBC would also be required to make unemployment health insurance contributions to the Medical Security Trust Fund, which provision applies unless an employer has five or fewer employees. See G. L. c. 151A, § 14G.

[6]The DET case began with DiMare's application for unemployment benefits, and he was, therefore, properly deemed a party. See G. L. c. 151A, § 12. DiMare's claim for unemployment benefits was denied pursuant to G. L. c. 151A, § 25(*e*), because he had voluntarily left his job. When DiMare failed to appeal from this adverse determination, the determination became final, and, in effect, DiMare's case ended. See G. L. c. 151A, § 39(*b*); *Conservation Commn. of Falmouth* v. *Pacheco*, 49 Mass. App. Ct. 737, 741-742 (2000). However, the independent status investigation of BBC commenced by DET on its own initiative under § 12 remained open. In these status proceedings, DiMare was only a nominal party, and the real parties in interest were BBC and the board. Thus, it was BBC's appeal that brought the case before the Boston Municipal Court. Notwithstanding that DiMare's claim was out of the litigation picture, and no appeal had been preserved on his claim, the judge addressed the merits of DiMare's claim to unemployment benefits. That issue

court reversed the determination of the board that BBC was subject to the Act. The board then filed this appeal. We reverse.

A detailed description of the facts in the administrative record concerning the nature of DiMare's activities in working for BBC and the terms and conditions of a contract that BBC had drafted and provided for execution by drivers, such as DiMare, is reserved for that part of the analysis addressed to BBC's contention that DiMare's activities were such as to render him an independent contractor. At this point, it will suffice to note that BBC is in the business of providing same-day pick-up and delivery services on an on-call basis. The pick-up items are generally letters and packages to be delivered between offices. BBC engages approximately twelve drivers for these courier services, of which DiMare was one.

2. *The legal framework for the § 2 independent contractor exemption.* The trigger for an employer's contribution liability to the unemployment compensation fund under the Act is whether there exists an employment relationship between the employing unit and an individual performing services. The term "employment" under the Act is inclusive,[7] and the Act is of broad reach.[8] To that end, the Act carves out exceptions, limited in number and scope.

The provision for an independent contractor exemption from the Act is set forth in G. L. c. 151A, § 2. See note 2, *supra*, for the pertinent text of § 2. In 1971, the Legislature dramatically altered the configuration of the § 2 exemption in two important respects. See St. 1971, c. 940, § 2. First, the amendment expressly rejected the previously applied — and potentially more open-ended — standard of employment that rested on

was not properly before the court. However, we need not speak to the point further because the same result obtains in that the judge's decision that DiMare was not entitled to unemployment benefits is in accord with the already final administrative determination to the same effect.

[7]Employment is defined in pertinent part as "service . . . performed for wages or under any contract, oral or written, express or implied, by an employee for his employer . . . ." G. L. c. 151A, § 1(*k*).

[8]In light of the Legislative purposes underlying the Act, "[t]he unemployment compensation statute itself directs that G. L. c. 151A 'shall be construed liberally in aid of its purpose, which purpose is to lighten the burden which now falls on the unemployed worker and his family.' " *Still* v. *Commissioner of the Dept. of Employment & Training*, 423 Mass. 805, 809 (1996), quoting from G. L. c. 151A, § 74.

common-law analysis. The effect of this first part of the amendment to § 2 was that an employer would be subject to the Act "irrespective of whether the common-law relationship of master and servant exists." *Ibid.* Thus, notwithstanding that the working relationship could be considered to be one of independent contract under common law, by the § 2 statutory standard, the worker may still be deemed in employment for purposes of the Act.[9] Second, the 1971 amendment added two new elements in § 2(*b*) and (*c*), which increased an employer's burden of proof and more narrowly circumscribed the kind of activities deemed to satisfy the independent contractor exemption. The three elements of proof, as amended and now set forth in § 2(*a*), (*b*), and (*c*), require that, in order to qualify for the independent contractor exemption, the employer must prove that the worker (a) is free from direction and control by the employing unit; (b) performs services outside the usual course of, or places of business of, the employing unit; and (c) the worker — albeit performing services of the same nature as the employing unit — is engaged in an independently established trade, occupation, profession or business wholly apart from the employing unit. See *Silva* v. *Director of the Div. of Employment Security*, 398 Mass. 609, 613-614 (1986). The elements are conjunctive. *Ibid.* This three-part test for the independent contractor exemption is commonly known as the "ABC" test.[10,11]

---

[9] Given this rejection of the common-law analysis, cases cited by BBC, such as *McDermott's Case*, 283 Mass. 74 (1933), that utilize such a common-law analysis are inapposite, as are cases such as *Nationwide Mut. Ins. Co.* v. *Darden*, 503 U.S. 318 (1992), and *Speen* v. *Crown Clothing Corp.*, 102 F.3d 625 (1st Cir. 1996), cert. denied, 520 U.S. 1276 (1997), which draw on wholly distinguishable statutes, e.g., the Federal Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1140, which has no textual connection to the specific statutory terms of § 2.

[10] Some States have modified the traditional three-tier approach of the ABC test. See Cotnoir, Employees or Independent Contractors: A Call For Revision of Maine's Unemployment Compensation "ABC Test," 46 Me. L. Rev. 325, 347-348 (1994). Other States have abandoned the ABC test in favor of a twenty-factor common-law approach. See *Tasters Ltd., Inc.* v. *Department of Employment Security*, 863 P.2d 12, 17, 22-27 (Utah App. 1993); *Matter of BKU Enterprises, Inc.*, 513 N.W.2d 382, 384-385 & nn.1-2 (N.D. 1994); *Stover Delivery Sys., Inc.* v. *Division of Employment Security*, 11 S.W.3d 685, 691-698 (Mo. App. 1999).

[11] See generally Hardman, Unemployment Compensation and Independent

The board concluded that BBC had failed to meet its burden with respect to all three statutory requirements in § 2(*a*)-(*c*), that is, all three segments of the ABC test. However, given the conjunctive burden under § 2, failure of proof on any one of subsections (*a*), (*b*), or (*c*) disqualifies an employer from the § 2 exemption. In this case, because the weight of evidence in the case record implicated the § 2(*c*) element, we will focus upon that exemption to determine whether the board decision that BBC failed to satisfy the § 2(*c*) requirements meets the applicable legal and evidentiary criteria for G. L. c. 30A appellate review. If the § 2(*c*) aspect of the board decision stands, we need not address the other conjunctive requirements in § 2 (*a*) and (*b*).

In review of the board's determination concerning § 2(*c*), we apply the overarching principle of administrative law that "[i]f the findings of the board are supported by substantial evidence, and if there is no error of law, the court must affirm the board." See *Silva*, 398 Mass. at 611. See also *Tri-County Youth Programs, Inc.* v. *Acting Deputy Director of the Div. of Employment & Training*, 54 Mass. App. Ct. 405, 407-408 (2002). Moreover, a court will afford deference to the function of the board in employment security cases. A reviewing court will accord "due weight to the experience, technical competence, and specialized knowledge of the agency, as well as to the discretionary authority conferred upon it." G. L. c. 30A, § 14(7). With respect to such deference, to be noted is the provision in § 2 that workers shall be deemed employees "unless and until it is shown to the satisfaction of the commissioner" that the exemption applies. G. L. c. 151A, § 2.

Contractors: The Motor Carrier Industry as a Case Study, 22 Transp. L.J. 15, 24-25 (1994) ("[T]he majority of the states follow the ABC test . . . . In applying this test, the service engager has the burden of proof; and all three prongs of the test must be met" [footnotes omitted] ). The note further describes the departure from common-law standards for the employer-employee relationship and the stricter standards that an employer must meet. "While under the common-law test, the issue of control is the dominant factor; and the lack of control may be an overwhelming consideration in the classification determination. This is not the case if the ABC test is involved. It carries no more weight than any of the other factors which are to be considered." *Id.* at 26 (footnotes omitted).

To meet its burden of proof under § 2(*c*) that DiMare, as one of its drivers, was "customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed," BBC was required to adduce evidence to establish that (1) DiMare customarily engaged in an independent courier delivery service on his own; (2) DiMare's courier delivery service operated wholly independently of his work for BBC; and (3) DiMare's business was established and running. This requirement is most commonly referred to as the "independent trade or business requirement."

A significant amount of case law construing identical or similarly worded provisions to § 2(*c*) has been developed in other jurisdictions.[12] A common methodology for review of this independent trade or business requirement is the so-called "proprietary interest test."[13] As developed in the case law, the

---

[12]See *Barb's 3-D Demo Serv.* v. *Director, Ark. Employment Security Dept.*, 69 Ark. App. 350, 353-356 (2000); *AFM Messenger Serv., Inc.* v. *Department of Employment Security*, 198 Ill. 2d 380, 397-398 (2001); *Hasco Mfg. Co.* v. *Maine Employment Security Commn.*, 158 Me. 413, 414-415, 418-419 (1962); *Koontz Aviation, Inc.* v. *Labor and Industrial Relations Commn.*, 650 S.W.2d 331, 332, 334 (Mo. App. 1983); *Standard Chem. Mfg. Co.* v. *Employment Security Div. of Mont. State Dept. of Labor & Indus.*, 185 Mont. 241, 247-252 (1980); *Weiss-Lawrence, Inc.* v. *Riley*, 100 N.H. 41, 45-46 (1955); *Revlon Serv., Inc.* v. *Employment Div.*, 30 Or. App. 729, 734-735 (1977); *Lake Preston Hous. Corp.* v. *South Dakota Dept. of Labor*, 587 N.W.2d 736, 738-739 (S.D. 1999).

Many States have codified guidelines and lists of factors to assist employers evaluating whether a worker is engaged in an independently established business. See, e.g., *Carpetland U.S.A., Inc.* v. *Illinois Dept. of Employment Security*, 201 Ill. 2d 351 (2002) (applying Ill. Admin. Code tit. 56, § 2732.200[e] [1990]); *Department of Labor, Lic. & Regulation* v. *Fox*, 346 Md. 484, 499-502 (1997) (applying Md. Regs. Code tit. 9, § 32.01.18(B)(3) [c]); Or. Rev. Stat. § 670.600(8) (2001); Wis. Stat. § 108.02(12)(b)(2) (1997). Massachusetts is not one of these States.

[13]The proprietary interest test has its origins in language appearing in *Life & Cas. Ins. Co. of Tenn.* v. *Unemployment Compensation Commn. of Va.*, 178 Va. 46 (1941). "We think that it is elemental that one engaged in an independent enterprise, business or profession has a proprietary interest therein to the extent that he can operate it without hindrance from any individual or force whatsoever. These agents have no business to which they have a right to continuity. They have nothing they can sell or give away. All they have is subject to cancellation and destruction upon severance from the company's service. The contract may be terminated by the company at any time without

formulations for the proprietary interest test provide a flexible standard that allows for comprehensive review of the working relationship based on the totality of relevant facts and circumstances, adjusted to the particularities of the performance of service associated with various industries. No individual factor is a prerequisite to a finding of an independently established business. See *Vendx Mktg. Co., Inc.* v. *Department of Employment*, 122 Idaho 890, 896 (1992). Rather, the relevancy and importance of specific indicia of proprietary interest will vary by the nature of the services provided in the working relationship and the industry in which the services are provided. See *Larsen* v. *State Dept. of Employment*, 106 Idaho 382, 383-384 (1984). The essential determination is whether "the worker is an entrepreneur and service is performed by him or her in that capacity." Hardman, Unemployment Compensation and Independent Contractors: The Motor Carrier Industry as a Case Study, 22 Transp. L.J. 15, 29 (1994).

More imagistically described, the proprietary interest test seeks to discern whether the worker is wearing the hat of an employee of the employing company, or is wearing the hat of his own independent enterprise. To establish the latter and qualify under the § 2(*c*) independent contractor standard, the insignia must be that of a freestanding, independent entrepreneurial business in which the worker has a proprietary interest. Recurring factors in the analyses in other jurisdictions tending to show a proprietary interest in an independently established trade or business include, but are not limited to, that: (1) the individual worker is free both to operate an independent enterprise and to perform services without hindrance from the employing unit; (2) the independent enterprise was created and exists separate and apart from the worker's relationship with the particular employing unit; (3) the worker's independent enterprise is not interconnected with, and is not dependent in any way upon, engagement by the particular employing unit, or other companies engaged in the subject industry; and (4) the worker's independent enterprise would survive as an ongoing

liability on its part for damages for breach of contract — a fact which negatives the existence of an independent relationship." *Id.* at 55-56.

business entity, notwithstanding the termination of the relationship with the employing unit.

3. *Analysis.* In accord with the prevailing analysis in this host of cases, we accept, and apply, the proprietary interest test as most consistent with the stringent requirements of § 2(*c*). In this case, to establish a proprietary interest and to meet the burden of proof on the independent trade or business requirement of § 2(*c*) (the prong "C" of the ABC test), BBC would have had been required to prove that DiMare performed other courier delivery services on his own behalf that were completely apart from those performed for BBC, and that this other separate courier delivery work exhibited economic independence such that DiMare's business would continue as an ongoing enterprise, notwithstanding the end of work for BBC. The board found BBC did not meet these standards. Based on our review of the administrative record, we conclude that this administrative determination was supported by substantial evidence.[14] The record demonstrated not independence, but rather an intertwining and an interdependent working relationship between a driver, such as DiMare, and BBC as the employing unit. Nor was there a freestanding entrepreneurial enterprise.[15]

On the question of a freestanding entrepreneurial enterprise

---

[14]The evidence indicated that, before his BBC engagement, DiMare worked in an entirely different field. While BBC states that drivers were permitted to work for other courier companies, BBC presented no evidence that DiMare actually provided delivery services for anyone other than BBC during or after his work for BBC, as would be expected of a true entrepreneur engaged in a permanent, lasting delivery services business. See *Veterans Servs., Inc.* v. *Labor & Indus. Relations Commn. of Mo.*, 861 S.W.2d 781, 785 (Mo. App. 1993).

[15]See generally Asia, Employment Relation: Common-Law Concept and Legislation Definition, 55 Yale L.J. 76, 87-88 (1945). "The third [C] test . . . appears to be at once the most radical departure from common-law criteria and the most relevant of the three tests to the purposes of the unemployment compensation program. In determining the point between the clearly servant status and the self-employed class at which the line of coverage for unemployment insurance is to be drawn, it seems most appropriate to distinguish between the person who pursues an established business of his own, who is not ordinarily dependent upon a particular business relationship with another for his economic survival, and other persons who are dependent upon the continuance of their relationship with a principal for their economic livelihood. [This C test] . . . depart[s] from the technical 'independence' of the common-law independent contractor and seem[s] to require that the individual perform-

in which DiMare purportedly had a proprietary interest, BBC did not make an adequate showing that DiMare held himself out as an independent businessman performing courier services for any community of potential customers. See *Lewiston Daily Sun* v. *Unemployment Ins. Commn.*, 733 A.2d 344, 347 (Me. 1999). BBC's evidence did not show that DiMare was able to operate a delivery business without the benefit of his relationship with BBC. Compare *AFM Messenger Serv., Inc.* v. *Department of Employment Security*, 198 Ill. 2d 380, 401-402 (2001). Indeed, in this case, so far as appears from the record, when DiMare's relationship with BBC terminated, so did his work in the delivery business. There was also no evidence that DiMare had his own clientele, utilized his own business cards or invoices, advertised his services or maintained a separate place of business and telephone listing. See *Department of Labor, Lic. & Regulation* v. *Fox*, 346 Md. 484, 499 (1997); *Appeal of Work-A-Day of Nashua, Inc.*, 132 N.H. 289, 292 (1989). Simply put, there was no evidence that DiMare had a proprietary interest in a going concern which could have been sold or transferred.

To the contrary, the evidence manifested DiMare's intertwined and dependent role as worker, rather than as independent entrepreneur. BBC provided DiMare, pursuant to a rental agreement, with both a radio and a pager, essential equipment in the on-call delivery business. See *Appeal of Work-A-Day of Nashua, Inc.*, 132 N.H. at 292 (investment in capital is one of the indicia of an independently established business). BBC, moreover, voluntarily purchased workers' compensation insurance for all of the delivery drivers. The risk of loss for nonpayment of the delivery charges fell squarely on BBC. See *Department of Labor, Lic. & Regulation* v. *Fox*, 346 Md. at 497, 500; *Larson* v. *Labor & Indus. Review Commn.*, 184 Wis. 2d 378, 390 n.6 (1994).

Further reflecting the dependent intertwining between BBC

---

ing services be engaged in a trade, occupation, profession, or business which is established independently of the particular connection he may have from time to time with certain principals. . . . The 'C' test, in summary, seems to draw the line of demarcation on an economic basis, so as to include within the Act those who perform services for an entrepreneur and who are not themselves acting as entrepreneurs in that connection in the pursuit of an independently established business, trade, or profession." *Ibid.*

and its drivers, the services provided by DiMare were an integral part of BBC's business. Indeed, without delivery drivers like DiMare, BBC could not operate — a factor supporting the finding that DiMare was an employee of BBC. See *Larsen* v. *State Dept. of Employment*, 106 Idaho at 384. BBC set the commission rates paid to drivers, such as DiMare, and set the prices charged for delivery services. BBC's customers contracted with BBC for delivery services, and not with particular drivers, such as DiMare. BBC guarded its customer list through nonsolicitation and noncompetition contractual provisions. Finally, BBC retained the right to terminate a driver and end the relationship for any reason upon thirty days' notice. See *Matter of BKU Enterprises, Inc.*, 513 N.W.2d 382, 388 (N.D. 1994) (the right to terminate at will without liability is strongly suggestive of an employee-employer relationship).[16]

To counter the weight of this evidence reflecting employment subject to the Act, BBC relies heavily on language contained in a document styled as an agreement "between the client [BBC] and independent contractor." This document was provided by BBC, which required all drivers to sign it. While a contract expressed in terms of engagement on an independent contractor

---

[16]This case is very close to the facts in *AFM Messenger Serv. Inc.* v. *Dept. of Employment Security, supra.* In that case, the Illinois Supreme Court held that "evidence did not demonstrate that the drivers were able to operate their 'delivery businesses' without the benefit of a relationship with AFM, or another messenger service company like AFM. AFM procured the customers; AFM set the delivery prices; AFM provided the delivery tickets to the customers; AFM made the delivery assignments; AFM billed the customers; AFM set the commission rate; AFM paid the drivers. AFM also retained the right, under the parties' written agreement which AFM supplied, to terminate their relationship at any time. Thus, a driver's 'business' was not established 'independently' of AFM. Rather, a driver's business existed only by reason of the driver's employment with AFM, which was subject to termination, at which time the driver would be unemployed." *Id.* at 401-402. Similar facts exist with respect to the working relationship between BBC and DiMare. Accord *Koontz Aviation, Inc.* v. *Labor & Industrial Relations Commn., supra* at 334 (similar analysis applied to baggage delivery drivers determined not to be independent contractors for purposes of the Missouri Employment Security Act). See *Matter of CDK Delivery Serv., Inc.*, 151 A.D.2d 932, 932-933 (N.Y. App. Div. 1989) (on substantially similar facts to those presented here, affirming decision that employment relationship existed between package delivery company and its drivers).

basis may be relevant to a status determination, the existence of such a contract is not controlling. In this regard, the Legislature, presumably aware of the possibility of artful contract drafting, included language in § 2 that requires the employer to prove the absence of control and direction over the worker *"both under his contract* for the performance of service *and in fact"* (emphasis supplied). This statutory language directs DET and a reviewing court to look beyond the four corners of the agreement to the actual working relationship.[17] So viewed, boilerplate language replete with designations and labels incorporated into form contracts by the employing unit may not be used as a subterfuge to avoid liability to the unemployment compensation fund when the agreement lacks any real foundation in the facts of the actual working relationship.

In the final analysis, the question whether an employer has satisfied the statutory requirements of § 2(*c*) and proved that a worker is engaged in providing services of the same nature in a freestanding, independent business enterprise in which the worker has a proprietary interest must be based upon a comprehensive analysis of the totality of relevant facts and circumstances of the working relationship. No one factor is outcome-determinative. Here, the totality of the evidence of the working relationship between BBC as the employing unit and DiMare as the worker failed to meet the criteria of § 2(*c*).[18]

4. *Conclusion.* The board's finding that BBC did not satisfy the statutory requirements for the § 2 independent contractor exemption was supported by substantial evidence and was not error of law. The judgment of the Boston Municipal Court is

[17]On this point, see generally *Matter of BKU Enterprises, Inc.*, 513 N.W.2d at 387; *AFM Messenger Serv., Inc.*, 198 Ill. 2d at 397.

[18]BBC also challenges the board's determination on the basis that on occasion DiMare hired another individual to assist with pick-ups and deliveries. In this case, even if this one factor that tends to reflect independent contractor status had been proved (BBC did not offer corroborating evidence on this claim), this claim as a single buoy would still not stem the tide of the other, much stronger current in the evidence which showed DiMare to be an employee. Compare *Electrolux Corp.* v. *Commonwealth of Pa., Dept. of Labor & Indus., Bureau of Employer Tax Operations*, 705 A.2d 1357, 1361 (Pa. 1998).

reversed and the case is remanded for the entry of a judgment affirming the decision of the board.

*So ordered.*