07-2871-cv
Sokol Holdings, Inc. v. BMB Munai, Inc.

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term, 2007

(Argued: October 26, 2007                    Decided: September 18, 2008)

Docket No. 07-2871-cv

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

SOKOL HOLDINGS, INC., BRIAN SAVAGE,
*and* THOMAS SINCLAIR,

    *Plaintiffs-Appellees*,

    -v.-

BMB MUNAI, INC., BORIS CHERDABAYEV,
ALEXANDRE AGAIAN, BAKHYTBEK
BAISEITOV, MIRGALI KUNAYEV,
GEORGES BENARROCH, CREDIFINANCE
CAPITAL, INC., *and* CREDIFINANCE
SECURITIES, LTD.,

    *Defendants-Appellants*.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Before: LEVAL, SOTOMAYOR, and B.D. PARKER, *Circuit Judges*.

Defendants appeal from the district court's denial of their motion to stay or dismiss plaintiffs'

action pending arbitration in Kazakhstan. The court of appeals (Leval, *J*.) affirms the rulings of the

district court in most respects. Where the corporate plaintiff contracted with a counterparty to purchase his interest in properties and to arbitrate disputes arising from the agreement, and where plaintiff then brought this action alleging that the defendants wrongfully induced the counterparty to breach the agreement by selling instead to them, the defendants may not rely on estoppel to compel plaintiff to arbitrate with them because, under the circumstances, neither can plaintiff's agreement to arbitrate be construed as implying an agreement to arbitrate its claim against the defendants, nor is there unfairness in allowing plaintiff to refuse to arbitrate this dispute. On the other hand, as to the claim seeking specific performance to bind the defendants to the obligations of the contract, the court vacates the ruling and remands. If defendants bear the obligations of the contract, they are entitled as well to the benefits accorded by the contract. *Affirmed in major part; as for the claim for specific performance, vacated and remanded.*

THOMAS E. L. DEWEY, Dewey Pegno & Kramarsky LLP, (Jerome M. Marcus, Jonathan Auerbach, Marcus Auerbach & Zylstra, LLC, Wyncote, PA; Jacob A. Goldberg, Jamie Mogil, Faruqi & Faruqi, New York, NY; *on the brief*), New York, NY, for *Plaintiffs-Appellees*.

KENNETH A. CARUSO, Bracewell & Giuliani LLP (Daniel S. Meyers, David A. Shargel, *on the brief*), New York, NY, for *Defendants-Appellants*.

LEVAL, *Circuit Judge*:

Defendants appeal from an order of the United States District Court for the Southern District of New York (Wood, *Chief Judge*) denying their motion under § 3 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 3, to stay or dismiss plaintiffs' action pending arbitration in Kazakhstan.

Defendants assert that they are entitled to arbitrate plaintiffs' claims, although they are not parties to the contract by which plaintiffs agreed to arbitrate. In support of their claim, they contend (1) plaintiffs are estopped from refusing to arbitrate because plaintiffs' claims are "intertwined" with the underlying contract, and because the factual allegations supporting those claims "touch matters" covered by the contract; and (2) if some, but not all, of the claims are deemed arbitrable, then the nonarbitrable claims should be stayed pending the arbitration.

As to all but one claim, we reject defendants' arguments and affirm the rulings of the district court. As to one claim, which seeks specific performance of the contract containing the arbitration clause, we conclude defendants are entitled to arbitrate. We reject defendants' contention that the nonarbitrable claims should be stayed pending resolution of the one arbitrable claim.

**Background**

Plaintiff Sokol Holdings, Inc. ("Sokol") is a Delaware corporation with its principal place of business in Colorado. Plaintiffs Brian Savage and Thomas Sinclair are Sokol's directors and principal officers. They formed Sokol in March 2003 for the purpose of exploring and developing oil and gas fields in the Republic of Kazakhstan. Sokol entered into a contract (the "Emir Contract") with Tolmakov Toleush Kalmukanovitch ("Tolmakov"), a citizen of Kazakhstan, to buy 70% of Tolmakov's 90% interest in Emir Oil LLP ("Emir"). Emir held a license to explore and develop the Aksaz-Dolinnaya-Emir oil and gas fields in Kazakhstan. The Emir Contract provides for the arbitration of all disputes arising from it in Kazakhstan.[1]

---

[1] The arbitration provision reads as follows: "The Parties shall resolve all disputes and disagreements arising from this Agreement through negotiations. Should the disputable issue be unsolved through negotiations within 30 days upon its arousal, the Parties shall transfer the disputable issue for its resolution at the International Arbitration Court of the Republic of

Defendant BMB Munai, Inc. ("BMB") is a publicly traded Nevada corporation with its principal place of business in Kazakhstan and an office in Salt Lake City, Utah. Defendants Boris Cherdabayev, Alexandre Agaian, Bakhytbek Baiseitov, Mirgali Kunayev, and Georges Benarroch are, or have been, directors and officers of BMB. (BMB and the individual defendants are collectively referred to as the "BMB defendants.") In this action, the BMB defendants are charged, *inter alia*, with tortious interference with Sokol's contract with Tolmakov.

Plaintiffs allege in their complaint that the BMB defendants tortiously interfered with Sokol's contract rights with Tolmakov under the Emir Contract and induced Tolmakov to sell his interest in Emir to BMB instead of Sokol. By reason of the BMB defendants' interference, plaintiffs allege they did not make payments to Tolmakov and Emir, which were required under the Emir Contract. Tolmakov then sold the Emir interest to BMB. BMB now employs Tolmakov as general manager of Emir.

The complaint asserts claims for: (1) tortious interference with contract, (2) specific performance, (3) breach of contract, (4) unjust enrichment, (5) two counts of breach of fiduciary duty, (6) unfair competition, (7) tortious interference with fiduciary duty, and (8) aiding and abetting breach of fiduciary duty.

Defendants moved to stay or dismiss the action pursuant to § 3 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 3, pending arbitration in Kazakhstan as provided in the Emir Contract. Recognizing that they had no contract with Sokol providing for arbitration, the BMB defendants nevertheless contended that given the circumstances of Sokol's suit against them, Sokol was estopped

Kazakhstan, to one or several arbitrators according to the regulations."

from refusing to arbitrate. In an opinion and order dated June 14, 2007, the district court denied defendants' motion. Citing authorities to the effect that a close relationship between the parties and intertwinement of the dispute with the underlying arbitration contract are essential elements for such an estoppel, the district court found that both elements were lacking. Defendants brought this appeal, pursuant to § 16(a)(1)(A) of the FAA.

## Discussion

Defendants rely principally on two arguments: (1) that Sokol is estopped from refusing to arbitrate its claims because the claims are "intertwined" with the Emir Contract, and because Sokol's factual allegations supporting those claims "touch matters" covered by the Emir Contract; and (2) that if this Court finds that some, but not all, of Sokol's claims should be sent to arbitration, then it should issue a stay of the remaining claims pending arbitration.

Except as to Sokol's specific performance claim, we affirm the rulings of the district court. As regards the claim for specific performance, we find that defendants are entitled to arbitrate that claim as currently pled, and thus vacate and remand that portion of the district court's judgment. We do not, however, require a stay of the nonarbitrable claims to await the resolution by arbitration of the one arbitrable claim.

**I.      Estoppel**

Defendants' main argument is that Sokol, being a signatory to an arbitration contract, should be estopped from refusing the demand of BMB, a nonsignatory, to arbitrate Sokol's claims against the BMB defendants because those claims are "intertwined" with the arbitration contract (the Emir Contract) from which the dispute arises. It is black letter law that an obligation to arbitrate can be based only on consent. *See Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489

5

U.S. 468, 479 (1989); *Vera v. Saks & Co.*, 335 F.3d 109, 116 (2d Cir. 2003) ("[A] party cannot be required to submit to arbitration any dispute which [it] has not agreed so to submit." (internal citation and quotation marks omitted)); *accord Westmoreland v. Sadoux*, 299 F.3d 462, 465 (5th Cir. 2002) ("An agreement to arbitrate is a waiver of valuable rights that are both personal to the parties and important to the open character of our state and federal judicial systems – an openness this country has been committed to from its inception."). Persons are generally entitled to have their dispute settled by the ruling of a court of law. *Cf. Tice v. Am. Airlines, Inc.*, 162 F.3d 966, 968 (7th Cir. 1998) ("It is a fundamental principle of American law that every person is entitled to his or her day in court."). It is essentially only by making a commitment to arbitrate that one gives up the right of access to a court of law in favor of arbitration. Most frequently such a commitment is made either by entering into an agreement to arbitrate or by entering into a relationship which is governed by an agreement to arbitrate.

It is undisputed that Sokol never made a contract with BMB for the arbitration of disputes between them. Sokol did, however, make a contract with Tolmakov, the Emir Contract, in which Sokol and Tolmakov agreed to arbitrate all disputes between them arising from the contract. BMB argues that because the dispute between Sokol and the nonsignatory BMB involves the question whether Tolmakov breached the Emir Contract, Sokol should be compelled by the terms of its contract with Tolmakov to arbitrate the dispute on BMB's demand.

BMB relies on rulings in our prior cases which have compelled a signatory to an arbitration contract to arbitrate disputes relating to that contract although the dispute was with an entity which was not a signatory to the arbitration contract. It relies particularly on language from our recent

opinion in *JLM Indus., Inc. v. Stolt-Nielson SA*, 387 F.3d 163 (2d Cir. 2004), quoting a prior opinion of our court, as follows:

> Our cases have recognized that under principles of estoppel, a non-signatory to an arbitration agreement may compel a signatory to that agreement to arbitrate a dispute where a careful review of "the relationship among the parties, the contracts they signed . . . , and the issues that had arisen" among them discloses that "the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed."

387 F.3d at 177 (quoting *Choctaw Generation Ltd. P'ship v. Am. Home Assurance Co.*, 271 F.3d 403, 406 (2d Cir. 2001)). Because Sokol must prove Tolmakov's breach of the Emir Contract in order to make out its claim for BMB's tortious interference with the contract, that claim is "intertwined" with the Emir Contract. According to the BMB defendants, Sokol, having agreed to arbitrate claims under the Emir Contract, should therefore be estopped from refusing to resolve the intertwined claim in arbitration.

The BMB defendants read more into the quotation from *JLM Industries* than that opinion intended. In the first place, the passage from *JLM Industries* did not purport to state a *standard* for estoppel; it rather described circumstances in which estoppel might be found. Thus, *JLM Industries* did not say or mean that whenever a relationship of any kind may be found among the parties to a dispute and their dispute deals with the subject matter of an arbitration contract made by one of them, that party will be estopped from refusing to arbitrate. In requiring a "careful review" of the relationship among the parties, the opinion did not explain what would be the purpose of the "careful review" or what kind of relationship would favor a finding of estoppel. It merely said that in such circumstances, estoppel vis-a-vis a nonsignatory might be found. What BMB's argument omits is that, in addition to the "intertwined" factual issues, there must be a relationship among the parties of

7

a nature that justifies a conclusion that the party which agreed to arbitrate with another entity should be estopped from denying an obligation to arbitrate a similar dispute with the adversary which is not a party to the arbitration agreement. A brief review of the cases in which we have allowed a nonsignatory to compel a signatory to arbitrate on an estoppel theory shows that these cases are characterized by circumstances which are absent here.

In describing the cases, to assist in understanding the recurring problems, we have used $x$ to denominate the party which entered into an arbitration contract but then refused to arbitrate with an entity that was not a party to the agreement; $y$ to designate $x$'s counterparty to the arbitration agreement; and $y^I$ to designate the entity associated with $y$, which successfully compelled $x$ to arbitrate with it on the basis of $x$'s promise to arbitrate with $y$, notwithstanding that $y^I$ was not a party to the arbitration agreement.

In *JLM Industries*, the plaintiff companies ($x$) were shippers of freight, which had signed contracts containing arbitration clauses for ocean carriage of their cargo. The plaintiffs alleged that the defendants, who were ocean carriers of cargo, had abused their market power, in violation of the Sherman Act, by conspiring to fix prices in their non-negotiable standard form contracts. The defendants, relying on the arbitration provision in the standard form contracts of carriage, moved to arbitrate the dispute. While some of the defendants ($y$) had signed arbitration contracts with the plaintiffs, other defendants ($y^I$) had not. The $y^I$ defendants were rather the corporate parents of the $y$ entities which had signed the arbitration contracts. Plaintiffs contended the $y^I$ defendants, being nonsignatories of the arbitration contracts, were not entitled to invoke the arbitration clause. We rejected the argument, ruling that, in such a dispute over the lawfulness of arbitrable contracts of carriage, the obligation to arbitrate could be invoked not only by the companies that had signed the

contracts but also by their parent companies. The plaintiff shippers were estopped from evading their contractual delegation to arbitrate by suing the parent of the signatory to the contract rather than the signatory itself. The circumstances justifying the estoppel depended on the nature of the relationship among the parties. The plaintiffs' own complaint acknowledged that "whatever corporate entities happened to sign the [charter contracts], [JLM] was purchasing shipping services directly from the parents . . . ." *Id.* at 178 (internal quotation marks omitted).

*Astra Oil Co., Inc. v. Rover Navigation, Ltd.*, 344 F.3d 276 (2d Cir. 2003), was another shipping dispute involving closely affiliated companies, this time on the cargo side. Rover Navigation ($x$), an ocean carrier, had entered into a charter party with AOT Trading AG ($y$), an affiliate of Astra Oil ($y^1$), for carriage of AOT's cargo for consignment to Astra. The charter party, which contained an arbitration clause, was negotiated on AOT's behalf by Astra. When Rover failed to make timely delivery of the cargo, Astra and AOT jointly demanded that Rover arbitrate the dispute. Rover contested its obligation to arbitrate with Astra as Astra was not a signatory to the contract. We rejected Rover's argument and permitted Astra ($y^1$) to enforce the arbitration clause against Rover ($x$), emphasizing the close affiliation between AOT and Astra of which Rover had been aware by having dealt with and accepted instructions from Astra and AOT interchangeably, treating them effectively as the same entity. *Id.* at 280-81.

In *Choctaw*, Choctaw ($x$) engaged Bechtel ($y$) to build a power generation facility. The construction contract between them contained an arbitration clause. Bechtel's performance under the construction contract was secured by a performance and payment bond (the "suretyship contract") issued by American Home Assurance Company ($y^1$). The suretyship contract did not explicitly contain an arbitration clause, but the construction contract, which did, was "referred to" and "made

9

a part" of the suretyship contract "as if fully set forth" therein. 271 F.3d at 405. When Bechtel failed to perform its obligation under the construction contract, and Choctaw made demands on American Home pursuant to the suretyship contract, American Home demanded that Choctaw arbitrate the dispute. Choctaw refused on the ground that it had no arbitration contract with American Home. We found that American Home ($y^1$) was entitled to compel Choctaw ($x$) to arbitrate. Bechtel's contract with Choctaw called for arbitration; American Home's dispute with Choctaw was in its role as guarantor of Bechtel's performance. And the suretyship contract between Choctaw and American Home incorporated by reference the construction contract with the arbitration clause. While cautioning that allowing a nonsignatory to compel arbitration "requires careful justification," we found it well justified in these circumstances. *Id.* at 406.

Finally, in *Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88 (2d Cir. 1999), we allowed the defendants ($y^1$), affiliates of Enron Corp. which were technically nonparties to the relevant arbitration contract because they had assigned their interest in the contract to other Enron affiliates, to invoke the obligation to arbitrate against the plaintiff Smith Cogeneration International, Inc. ("Smith"). Smith ($x$) had entered into a joint venture contract with two Enron affiliates for the development of a power plant in the Dominican Republic. The contract included an obligation to arbitrate all disputes in New York. *Id.* at 90. With the knowledge and consent of the Smith plaintiff, the Enron affiliates then assigned their interest in the contract to other Enron affiliates. *Id.* at 90-91. As the result of these agreements, the latest Enron affiliates to which the contract had most recently been assigned became the parties ($y$) to the arbitration contract, and the original signatories ($y^1$) ceased to be a party to it.

When the Smith plaintiff became unable to fulfill its commitments to the joint venture, the relationship between Smith and Enron soured. The Smith plaintiff brought suit in the courts of the Dominican Republic against the entities with which it had originally contracted ($y^1$), taking care not to join as parties the current assignees ($y$) to the arbitration contract. *Id.* at 91. Smith's suit sought rescission of the joint venture contract and damages based on allegations of breach of the contract. The Enron defendants filed a petition in the Southern District of New York to compel arbitration of the Dominican lawsuit. Smith argued to the New York district court that the Enron defendants no longer could enforce the arbitration agreement because, having assigned their interests in it to affiliates, they were no longer parties to it. We rejected Smith's objections to arbitration, concluding that there was an "identity of interests between [the Enron defendants] and the current Enron signatories [to which the contract interest had been assigned]," which identity of interest had been established with the knowledge and consent of Smith, and which "justifie[d] allowing the Enron petitioners to invoke the arbitration clause," even if they were no longer parties to it. *Id.* at 97.

While in none of these cases did the court explain what it was that justified the estoppel, examination of the facts shows a pattern which is consistent with the basic principle that one does not give up one's right to court adjudication except by consent. In each case, the promise to arbitrate by $x$, the entity opposing arbitration, was reasonably seen on the basis of the relationships among the parties as extending not only to $y$, its contractual counterparty, but also to $y^1$, an entity that was, or would predictably become, with $x$'s knowledge and consent, affiliated or associated with $y$ in such a manner as to make it unfair to allow $x$ to avoid its commitment to arbitrate on the ground that $y^1$ was not the very entity with which $x$ had a contract. The estoppel did not flow merely from $x$'s agreement to arbitrate with *someone* ($y$) in disputes relating to the agreement. It flowed rather from the

11

conclusion that the relationships among the parties developed in a manner that made it unfair for $x$ to claim that its agreement to arbitrate ran only to $y$ and not to $y^1$. It was, of course, essential in all of these cases that the subject matter of the dispute was intertwined with the contract providing for arbitration. Indeed, if the dispute had not been related to the arbitration contract, even a dispute between the parties who contracted with one another to arbitrate *(x and y)* would not have been arbitrable. While the arbitrability of the subject matter of the dispute was an essential condition to a finding of estoppel, however, it was not sufficient to justify that conclusion. As we implied in *JLM Industries* in requiring a "careful review of the relationship among the parties," 387 F.3d at 177 (internal quotation marks omitted) the further necessary circumstance was a relationship among the parties which either supported the conclusion that $x$ had consented to extend its agreement to arbitrate to $y^1$, or, otherwise put, made it inequitable for $x$ to refuse to arbitrate on the ground that it had made no agreement with $y^1$. *See Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 533 (5th Cir. 2000) (Dennis, J., dissenting) (arguing that the decisions in which courts have applied the alternative estoppel theory are really based on "an agreement implied in fact rather than an ordinary equitable or promissory estoppel"). The cases, in other words, are consistent with the black letter rule that the obligation to arbitrate depends on consent. They simply extend its contours somewhat by establishing that the consent need not always be expressed in a formal contract made with the party demanding arbitration.

BMB claims to be covered by these precedents because it has a "close corporate and operational relationship" with Tolmakov, Sokol's counterparty to the Emir Contract. That close relationship, BMB argues, is based on the fact that Tolmakov sold his controlling block of the stock of Emir to BMB, Emir is now BMB's wholly-owned subsidiary, and Tolmakov is the general

12

manager of Emir. BMB's argument makes a mockery of the precedents on which it relies. According to the theory of Sokol's complaint, BMB came into its close relationship with Tolmakov by wrongfully inducing Tolmakov to breach his contract with Sokol. Where $y^1$ has become aligned or associated with $y$, which is a party to an arbitration contract with $x$, and has done so by wrongfully inducing $y$ to breach its obligation under that contract with $x$, there would be no unfairness in allowing $x$, the victim of the tortious interference, to insist that, while he agreed to arbitrate with his contractual counterparty $y$, he in no way consented to extend that agreement to an entity which tortiously subverted his rights under the agreement. Given the present facts, there is no basis for finding either that Sokol consented to arbitrate with BMB, or that there would be unfairness in allowing Sokol to refuse to arbitrate with BMB on the ground that BMB was not a party to Sokol's arbitration agreement.

Accordingly, as to all of Sokol's claims, excepting its claim for specific performance, which we discuss below, we affirm the district court's denial of BMB's motion to stay or dismiss the action pending arbitration.

**II.     Specific Performance**

As to Sokol's claim against BMB for specific performance of the Emir Contract, our analysis is somewhat different. In suing BMB for specific performance of the Emir Contract, Sokol essentially asserts that BMB is a party to that contract and can thus be compelled to perform its contractual obligations. *Cf. 75 Christopher St. Corp. v. Furman*, 526 N.Y.S.2d 111, 112 (App. Div. 1st Dep't 1988) (noting that under New York law, a plaintiff can obtain specific performance only from a party to a contract). If BMB is a party to the Emir Contract, then all the terms of the contract

apply to it, including its provision that disputes be settled by arbitration in Kazakhstan. In defending this claim, BMB may properly insist on entitlement under the terms of the contract to arbitration.

Sokol advises that it did not intend by seeking specific performance to treat BMB as a party to the contract. It was merely seeking some legal mechanism for compelling BMB to turn over the development of the oil fields, to which Sokol claims it was entitled under the Emir Contract. Sokol suggested at oral argument that for this claim it should perhaps have relied on a different theory, such as unjust enrichment, and some form of injunctive relief. We express no view as to what theory Sokol should pursue. It is free to discontinue its claim for specific performance if it so chooses, and may seek the district court's leave to replead. However, insofar as Sokol pursues against BMB a claim for specific performance of the Emir Contract, BMB may insist on the right provided by that contract to resolve the claim by arbitration. We therefore reverse the ruling of the district court only as to the claim for specific performance of the Emir Contract. That claim should be stayed or dismissed pending arbitration as provided in the contract.

## III.    Stay of Nonarbitrable Claims

Defendants ask that we stay proceedings in the district court on nonarbitrable claims in the event that we find some, but not all, of Sokol's claims to be arbitrable. We have found one of Sokol's claims – specific performance – to be arbitrable, while the others are not. It appears, however, that the only arbitrable claim was pleaded in error and will not be pursued. In this case, it would be inappropriate to stay the nonarbitrable claims pending the resolution of the other claims through arbitration. The demand for a stay is denied.

14

**Conclusion**

For the reasons stated above, we affirm the rulings of the district court denying the defendants' motion for stay or dismissal pending arbitration, with the exception of its ruling on the claim for specific performance of the Emir Contract, as to which the district court's ruling is vacated. Remanded for further proceedings.