NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11681


EDSON TELES MACHADO & others[1]  vs.  SYSTEM4 LLC & another.[2]



Norfolk.     December 4, 2014. - April 13, 2015.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk, &
Hines, JJ.



Massachusetts Wage Act.  Contract, Franchise agreement,
     Arbitration.  Arbitration, Damages, Arbitrable question.




Civil action commenced in the Superior Court Department on
March 24, 2010.

Following review by this court, 465 Mass. 508 and 466 Mass.
1004 (2013), a motion for a ruling that an arbitration clause
did not apply to certain claims was heard by Patrick F. Brady,
J.

The Supreme Judicial Court granted an application for
direct appellate review.


Eric H. Karp for the defendants.
Shannon Liss-Riordan for the plaintiffs.


_____

[1] Jocilene da Silva, Stenio Ferreira, Poliane Santos,
Glaucea de Oliveira Santos, and Luiz Santos.

[2] NECCS, Inc., doing business as System4 of Boston, LLC
(NECCS).

CORDY, J.   This case was filed in 2010 by a franchisee janitorial worker, on behalf of himself and other similarly situated individuals, against System4 LLC (System4), a "master franchisor," and NECCS, Inc., doing business as System4 of Boston, LLC (NECCS), a regional "subfranchisor," originally alleging, in relevant part, breach of contract, rescission of contract, and misclassification as independent contractors in their franchise agreements.[3]  The franchise agreements are signed only by the plaintiffs and NECCS; however, the complaint as originally filed, and as subsequently amended, does not differentiate NECCS from System4 and alleges that the former is "the agent of" and "exists solely to conduct [the] business" of the latter.  The agreements govern a franchisee's right to customer account referrals and the use of System4's proprietary information in operating commercial janitorial cleaning businesses.  They also require the franchisee plaintiffs to arbitrate virtually all disputes.

While the plaintiffs raise a number of arguments on appeal, of central importance is the question whether System4, a nonsignatory, can compel the franchisee plaintiffs to arbitrate

---

[3] Edson Teles Machado, Jocilene da Silva, Poliane Santos, and Luiz Santos (collectively, franchisee plaintiffs) are parties to agreements to operate System4 LLC (System4) franchises.  Two other plaintiffs, Stenio Ferreira and Glaucea de Olivera Santos, have not signed franchise agreements and appear to be employees of the franchisee plaintiffs.

their substantive claims in accord with the arbitration provision in the plaintiffs' franchise agreements.  We conclude that by reason of equitable estoppel they can do so in the circumstances of this case.

Background.  System4, an Ohio limited liability company, contracts with a regional subfranchisor in the Boston area, NECCS, who subsequently enters into franchise agreements with franchisees, such as the plaintiffs.[4]  Although System4 is not a signatory to these agreements, the agreements provide the franchisees with access to System4's marketing expertise, business practices, training, and use of trademarks, by way of a separate agreement between System4 and NECCS.

1.  Arbitration clause.  The franchisee plaintiffs are parties to agreements to operate System4 franchises (franchise agreements).  Under these agreements, NECCS offers its franchisees customer accounts to service, which the franchisees are free either to accept or refuse.  The agreements purport to guarantee gross monthly billings to the franchisees based on the value of the customer accounts offered to them.  In addition, the agreements authorize the franchisees to use System4's proprietary information, including its brand and trademarks.

---

[4] The subfranchisor of System4 used to be System4 of Boston, LLC (System4 of Boston), but in March, 2008, NECCS purchased System4 of Boston and assumed all of its rights under the franchise agreements.  Consequently, we will refer to NECCS, rather than System4 of Boston, throughout this opinion.

The agreements characterize the franchisees as independent contractors, a characterization they contest, and each agreement contains an arbitration clause.

The arbitration clause is broad in scope, requiring arbitration of any claims between the franchisee and NECCS and its subsidiaries, affiliates, shareholders, officers, directors, managers, representatives, and employees, arising out of or related to:

> (1) the franchise agreement or any other agreement between the parties, including claims related to the validity of the franchise agreement or any other agreement;
>
> (2) NECCS's relationship with the franchisee; or
>
> (3) claims relating to the operation of the franchised business.

Accordingly, virtually all claims arising out of the franchise relationship are subject to arbitration.[5]

2. **Plaintiffs as franchisees**. Machado, the original named plaintiff in this action, signed a franchise agreement with NECCS on February 14, 2008, initialing each page. After signing his franchise agreement, Machado both rejected and accepted offers extended to him by NECCS to service customer accounts. In October, 2008, Machado informed NECCS that he wished to sell

---

[5] The only types of claims not subject to the arbitration clause are those by NECCS involving a threat or danger to public health or safety in connection with the operation of a franchise, actions by NECCS to protect its trademarks, and actions by either NECCS or the franchisee to obtain a temporary restraining order or injunction.

his franchise, and he stopped performing services for his accounts. In November, 2008, Machado spoke with the president of NECCS, Jonathan Caffrey, and asked for his franchisee fees back. When Caffrey declined to return the fees, Machado ceased communication with NECCS.

3. <u>Procedural history</u>. Machado filed a complaint in the Superior Court in March, 2010, on behalf of himself and "other similarly situated individuals." In so doing, Machado named both System4 and NECCS as defendants, and claimed that both had committed a breach of the franchise agreement by not providing him with sufficient customer accounts. In addition, Machado claimed that both defendants misclassified him as an independent contractor in the agreement and committed other violations of the Massachusetts Wage Act, G. L. c. 149 §§ 148, 148B, and 150 (Wage Act).

In June, 2010, the defendants, citing the arbitration clause in Machado's franchise agreement, filed a motion to stay the court proceedings pending arbitration. A judge denied the motion, holding that the arbitration agreement was unenforceable because it contained waivers of class proceedings and multiple damages. Subsequently, in April, 2011, the United States Supreme Court held in <u>AT&T Mobility LLC</u> v. <u>Concepcion</u>, 131 S. Ct. 1740 (2011) (<u>Concepcion</u>), that the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq. (2012) (FAA), prohibits States from

conditioning the enforceability of arbitration agreements on the availability of class action procedures.

Thereafter, Machado amended his complaint, adding additional named plaintiffs as well as a putative class[6] of individuals who had performed cleaning services for NECCS and System4. The amended complaint again asserted claims against both defendants without differentiation, seeking rescission of the franchise agreements and damages for misclassification among other violations of the Wage Act.[7]

In December, 2011, the defendants moved for reconsideration of the denial of their motion to compel arbitration in light of Concepcion. The judge denied the defendants' motion, and the defendants petitioned for interlocutory review. A single justice of the Appeals Court referred the issue to a full panel of the Appeals Court, and we granted the plaintiffs' application for direct appellate review. The appellate filings of both the plaintiffs and the defendants in that interlocutory appeal addressed the enforceability of the arbitration clause as a whole and made no argument as to whether the arbitration clause,

---

[6] A motion for class certification has yet to be filed.

[7] The amended complaint did not contain a breach of contract claim, although it alleged that the defendants made numerous misrepresentations in connection with the franchise agreements, including that they would provide the plaintiffs with business leads and make prompt payments as promised in their agreements.

if enforceable, would require arbitration of the plaintiffs' claims only against NECCS and not System4.

We issued a decision in June, 2013, but stayed issuance of the rescript until August, 1, 2013, pending submissions by the parties on the effect, if any, of the United States Supreme Court's decision in American Express Co. v. Italian Colors Restaurant, 133 S. Ct. 2304 (2013).  See Machado v. System4 LLC, 465 Mass. 508 (2013) (Machado I).  In light of the decisions of the United States Supreme Court, we concluded that a class action waiver provision was not an adequate ground on which to invalidate an agreement to arbitrate.  See Machado v. System4 LLC, 466 Mass. 1004, 1004 (2013) (Machado II).  See also Machado I, supra at 513-517.  We then remanded the case to the Superior Court judge for proceedings consistent with our decision.  See Machado II, supra.

Subsequently, the plaintiffs filed a motion, as well as a posthearing letter, again asking the judge to deny the defendants' motion to compel arbitration on several grounds: first, that the arbitration clause could not apply to their Wage Act claims because it did not specifically reference the Wage Act, an argument that was based on our decision in Crocker v. Townsend Oil Co., 464 Mass. 1, 14 (2012) (holding that release of claims must specifically reference Wage Act in order to apply

to Wage Act claims);[8] second, that the arbitration clause was unenforceable, as it contained multiple unconscionable provisions; and third, that the plaintiffs were not bound to arbitrate their claims against System4 because it was not a signatory to the franchise agreements. The judge rejected the plaintiffs' Wage Act claim and also held that issues of unconscionability of the arbitration clause could be decided by an arbitrator. However, the judge agreed with the plaintiffs that, because System4 was not a signatory to the franchise agreements, the plaintiffs could proceed to litigate their claims against System4 in court.

System4 appealed the judge's decision regarding the enforceability of the arbitration clause as applied to it. The plaintiffs did not file a cross appeal regarding the judge's decision denying them relief on their other grounds, but filed an application for direct appellate review, which we granted. The plaintiffs ask us to affirm the judge's reasoning in declining to enforce the arbitration clause with respect to System4 or, in the alternative, to affirm the ruling on one of the grounds rejected by the judge.

---

[8] This argument was first presented to this court by the plaintiffs in July, 2013, in a postargument letter after our decision in Machado v. System4 LLC, 465 Mass. 508 (2013), was released.

Discussion. Denials of applications to compel arbitration are reviewed de novo. See Joulé, Inc. v. Simmons, 459 Mass. 88, 92-93 (2011); Feeney v. Dell Inc., 454 Mass. 192, 199 (2009), S.C., 465 Mass. 470, and 466 Mass. 1001 (2013). See also Warfield v. Beth Israel Deaconess Med. Ctr., Inc., 454 Mass. 390, 395 (2009) (motion to compel arbitration treated summarily and judge's order reviewed de novo). The Massachusetts Arbitration Act, G. L. c. 251, similarly to the FAA, "expresses a strong public policy favoring arbitration as an expeditious alternative to litigation for settling commercial disputes." Miller v. Cotter, 448 Mass. 671, 676 (2007), quoting Home Gas Corp. of Mass., Inc. v. Walter's of Hadley, Inc., 403 Mass. 772, 774 (1989). "[T]he lack of a written arbitration agreement is not an impediment to arbitration." Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc., 10 F.3d 753, 757 (11th Cir. 1993), cert. denied sub nom. Sunkist Growers, Inc. v. Del Monte Corp., 513 U.S. 869 (1994).

1. Nonsignatory compulsion of signatory to arbitrate. We begin our discussion with a consideration of whether System4, a nonsignatory to the franchise agreements, can compel the plaintiffs to pursue their substantive claims in arbitration based on the agreements they entered into with NECCS.

In Depianti v. Jan-Pro Franchising Int'l, Inc., 465 Mass. 607, 622, 624-625 (2013), we recently held that a franchisee,

much like the plaintiffs in this case, could hold a nonsignatory to his franchise agreement liable for misclassifying him as an independent contractor in that agreement if the nonsignatory had attempted to insulate itself from liability by "causing or creating another entity to [enter the agreement]."  This is essentially what the plaintiffs allege here, that is, that NECCS was created solely to conduct System4's franchising business in Massachusetts; that the franchise agreements are System4's standard form contracts; and that System4 controls the relationships between the parties and between the plaintiffs and their clients.  Therefore, they argue, System4 is just as liable for the misclassification in their franchise agreements as NECCS, even though System4 did not sign them.  Although denying liability and an agency relationship with NECCS, System4 essentially argues that where the plaintiffs contend that System4 was effectively the franchisor, the creator of the agreements and their terms, the violator of those terms, and the beneficiary of the purported misclassification term, any dispute arising out of the agreements should be resolved in accord with the arbitration clause that provides for such dispute resolution.

While a nonsignatory attempting to bind a signatory to an arbitration agreement is distinct from a signatory attempting to bind a nonsignatory, courts often consider both scenarios under

a similar legal framework.  Traditionally, courts have recognized six theories for binding nonsignatories to arbitration agreements:  (1) incorporation by reference;[9] (2) assumption;[10] (3) agency;[11] (4) veil-piercing/alter ego;[12] (5) equitable estoppel, and (6) third-party beneficiary.[13]  See J.E. Grenig, Alternative Dispute Resolution § 7:4 (3d ed. 2005).  See

---

[9] Under the "incorporation by reference" theory, "[a] nonsignatory may compel arbitration against a party to an arbitration agreement when that party has entered into a separate contractual relationship with the nonsignatory which incorporates the existing arbitration clause."  Thomson-CSF, S.A. v. American Arbitration Ass'n, 64 F.3d 773, 777 (2d Cir. 1995).

[10] Under an "assumption" theory, "a party may be bound by an arbitration clause if its subsequent conduct indicates that it is assuming the obligation to arbitrate," despite being a nonsignatory.  Thomson-CSF, S.A., 64 F.3d at 777.

[11] Under an "agency" theory, a nonsignatory who is an agent of a signatory may compel arbitration for liability arising under the contract in question.  Bridas S.A.P.I.C. v. Government of Turkmenistan, 345 F.3d 347, 356-358 (5th Cir. 2003), cert. denied, 541 U.S. 937 (2004).  Here, while an agency relationship arguably might exist between System4 and NECCS, System4 denies that it "exercises sufficient control over NECCS" to create such a relationship.

[12] Under a "veil-piercing/alter ego" theory, a party "may be bound by an agreement entered into by its subsidiary regardless of the agreement's structure or the subsidiary's attempts to bind itself alone to its terms, 'when their conduct demonstrates a virtual abandonment of separateness.'"  Bridas S.A.P.I.C., 345 F.3d at 358-359, quoting Thomson-CSF, S.A., 64 F.3d at 777. System4 explicitly denies having control over NECCS.

[13] Under a "third-party beneficiary" theory, "a court must look to the intentions of the parties at the time the contract was executed" and examine whether the contract displays a clear intent to make a nonsignatory a third-party beneficiary.  See Bridas S.A.P.I.C., 345 F.3d at 362 (citation omitted).

also <u>Walker</u> v. <u>Collyer</u>, 85 Mass. App. Ct. 311, 319 (2014);
<u>Bridas S.A.P.I.C</u>. v. <u>Government of Turkmenistan</u>, 345 F.3d 347,
356 (5th Cir. 2003), cert. denied, 541 U.S. 937 (2004).
Notably, while Federal courts have been "hesitant to estop a
nonsignatory seeking to avoid arbitration," they generally "have
been willing to estop a signatory from avoiding arbitration with
a nonsignatory." <u>InterGen N.V</u>. v. <u>Grina</u>, 344 F.3d 134, 145-146
(1st Cir. 2003), quoting <u>Thomson-CSF, S.A</u>. v. <u>American
Arbitration Ass'n</u>, 64 F.3d 773, 779 (2d Cir. 1995).

The theory with clearest application to the facts of this
case is equitable estoppel, a doctrine governed by State
contract law. See <u>Arthur Andersen LLP</u> v. <u>Carlisle</u>, 556 U.S.
624, 632 (2009). There are no reported Massachusetts appellate
decisions determining whether this doctrine may be applied to
extend the reach of an agreement to compel a signatory into
arbitration with a nonsignatory. Nevertheless, we are guided in
our analysis by several circuit courts of the United States
Court of Appeals that have applied equitable estoppel in this
precise context. And while "[t]he [Federal circuit courts] have
not uniformly articulated the standards for application of
estoppel, . . . their formulations have contained common
elements." <u>Lenox MacLaren Surgical Corp</u>. v. <u>Medtronic, Inc</u>.,
449 Fed. Appx. 704, 708 (10th Cir. 2011).

Equitable estoppel typically allows a nonsignatory to compel arbitration in either of two circumstances: (1) when a signatory "must rely on the terms of the written agreement in asserting its claims against the nonsignatory" or (2) when a signatory "raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract."[14] Grigson v. Creative Artists Agency, L.L.C., 210 F.3d 524, 527 (5th Cir.), cert. denied, 531 U.S. 1013 (2000), quoting MS Dealer Serv. Corp. v. Franklin, 177 F.3d 942, 947 (11th Cir. 1999). In such situations, a reviewing court may consider all of "the relationships of persons, wrongs and issues" in the case. Merrill Lynch Inv. Managers v. Optibase, Ltd., 337 F.3d 125, 131 (2d Cir. 2003), citing Chocotaw Generation Ltd. Partnership v. American Home Assur. Co., 271 F.3d 403, 406 (2d Cir. 2001).

a. Reliance on terms of written agreement. When the signatory's claims against a nonsignatory refer to or presume the existence of the written agreement that compels arbitration, the signatory's claims may be considered to arise out of and be

---

[14] Not all jurisdictions apply this test. See, e.g., Smith v. Mark Dodge, Inc., 934 So. 2d 375, 380-381 (Ala. 2006), quoting Ex parte Napier, 723 So. 2d 49, 51 (Ala. 1998) (court will consider whether arbitration may be compelled under equitable estoppel doctrine only if arbitration agreement is written in broad language so that it applies, e.g., to "[a]ll disputes, claims or controversies arising from or relating to this [c]ontract or the relationships which result from this [contract]").

directly intertwined with that agreement, rendering arbitration appropriate. See <u>CD Partners, LLC</u> v. <u>Grizzle</u>, 424 F.3d 795, 798 (8th Cir. 2005). Essentially, if a party's claims are so intimately founded in and closely related to an agreement which also mandates arbitration, the party opposing arbitration is equitably estopped from denying the arbitrability of its claims, even against a nonsignatory.[15] "The plaintiff's actual dependence on the underlying contract in making out the claim against the nonsignatory defendant is therefore always the sine qua non of an appropriate situation for applying equitable estoppel." <u>Lenox MacLaren Surgical Corp</u>., 449 Fed. Appx. at 710 (citation omitted).

---

[15] Not all jurisdictions consider the intertwining nature of the claims to be, on its own, a sufficient basis for equitable estoppel. For example, the United States Court of Appeals for the Second Circuit has said that while this is an essential prerequisite, there must also be a relationship among the parties of a nature that justifies a conclusion that the signatory should be estopped from denying an obligation to arbitrate a dispute with a nonsignatory. See <u>Sokol Holdings, Inc.</u> v. <u>BMB Munai, Inc.</u>, 542 F.3d 354, 358-359 (2d Cir. 2008). See also <u>Ross</u> v. <u>American Express Co</u>., 547 F.3d 137, 143-144 (2d Cir. 2008). Echoing this sentiment, the United States Court of Appeals for the Tenth Circuit in <u>Lenox MacLaren Surgical Corp.</u>, v. <u>Medtronic, Inc</u>., 449 Fed. Appx. 704, 710 (10th Cir. 2011), held that allegations of collusion alone are insufficient; the claims must also be "intimately founded in and intertwined with the obligations imposed by the contract containing the arbitration clause" (citation omitted). Additionally, one Missouri court has held that even if claims are "inextricably intertwined," compelling a signatory to arbitrate with a nonsignatory is inconsistent with the general principle that arbitration is ultimately a matter of agreement between the parties. <u>Jones</u> v. <u>Paradies</u>, 380 S.W.3d 13, 17-18 (Mo. Ct. App. 2012).

Courts frequently rule in favor of nonsignatories in such circumstances because "it would be unfair to allow the signatory to rely on the agreement in formulating its claims but to disavow availability of the arbitration clause of that same agreement." PRM Energy Sys., Inc. v. Primenergy, L.L.C., 592 F.3d 830, 835, 836 (8th Cir. 2010) (permitting arbitration under equitable estoppel theory in part because allegations were intimately founded in and intertwined with agreement containing arbitration clause). See CD Partners, LLC, 424 F.3d at 800-801 (arbitration compelled where franchisee's claims arose directly out of and related to its operation of franchises under agreement containing arbitration clause).

For example, in JLM Indus., Inc. v. Stolt-Nielsen SA, 387 F.3d 163, 177-178 (2d Cir. 2004), the court held that nonsignatory ship owners could compel arbitration when charterers alleged that the owners conspired to inflate price terms in contracts between the charterers' and the owners' subsidiaries, as these claims were "undeniably intertwined" with the contracts containing an arbitration clause. Additionally, in Grigson, 210 F.3d at 529-531, a different court held that allegations that nonsignatories tortiously interfered with a film distribution agreement containing an arbitration clause were sufficiently intertwined with the agreement to compel arbitration where the very essence of the claims required a

determination whether the nonsignatories had fulfilled their obligations under the agreement.

Similarly, here, the plaintiffs assert multiple claims that arise out of and relate directly to terms within the franchise agreements containing the arbitration clause.  Contrast In re Wholesale Grocery Prods. Antitrust Litig., 707 F.3d 917, 921-924 (8th Cir. 2013) (no equitable estoppel where signatory alleged no violation of contract terms and signatory's claims existed independently of agreement containing arbitration clause). Specifically, the plaintiffs allege both that the defendants misclassified the plaintiffs as independent contractors in the agreements and used unfair and deceptive business practices that misrepresented the terms of their contractual relationship. Indeed, it is the franchise agreements themselves that the plaintiffs allege created the service relationship between them and the defendants, mischaracterized the relationship as one of independent contractor rather than employee, and "contain[ed] numerous provisions that are unfair, unconscionable, [and] against public policy."

These claims are inextricably intertwined with and relate directly to the franchise agreements containing the arbitration provision.  In particular, the plaintiffs' request for contract rescission and allegations of unenforceability necessarily depend on an analysis of the terms, provisions, and warranties

delineated within their agreements.  See Liles v. Ginn-La West End, Ltd., 631 F.3d 1242, 1255-1257 (11th Cir. 2011) (per curiam) (nonsignatory defendants could invoke forum-selection clause under equitable estoppel theory as plaintiffs' claim of rescission depended on contract containing clause); Townsend v. Quadrant Corp., 173 Wash. 2d 451, 461-462 (2012) (nonsignatory defendants could compel arbitration under equitable estoppel in part because plaintiffs' claim of contract rescission related directly to agreement containing arbitration clause).  See also Villanueva v. Barcroft, 822 F. Supp. 2d 726, 738-739 (N.D. Ohio 2011) (forum selection clause applicable under equitable estoppel where plaintiff's claim relied on contract containing clause); World Gym, Inc. vs. Pla-Fit Franchise, LLC, U.S. Dist. Ct., No. 12-11620-DJC (D. Mass. July 19, 2013) (permitting nonsignatory to compel arbitration by way of equitable estoppel where plaintiffs' claims depended on provisions of franchise agreement that contained arbitration clause).  Contrast InterGen N.V., 344 F.3d at 138, 140, 145-146 (no basis for equitable estoppel where, inter alia, complaint did not allege breach of contract nor sought to enforce any contractual right).[16]

---

[16] Moreover, as both the plaintiffs' rights and the responsibilities of NECCS were delineated under the franchise agreements, the plaintiffs inevitably rely on the terms contained therein when asserting the unenforceability of various contractual provisions.

As for assessing the merits of the plaintiffs' claim regarding misclassification, a decision maker would be compelled to, among other things, compare the rights and responsibilities assigned to the plaintiffs in the franchise agreements to the elements of employee status under the Wage Act.  Section 148B, commonly referred to as the independent contractor statute, requires an entity to demonstrate that a purported independent contractor is "free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact" (emphasis added).  G. L. c. 149, § 148B (a) (1).  This statutory language directs a look both at the worker's agreement, if any, as well as the actual working relationship.  See Depianti, 465 Mass. at 622; Subcontracting Concepts, Inc. v. Commissioner of the Div. of Unemployment Assistance, 86 Mass. App. Ct. 644, 649 n.7 (2014) (addressing similar language in G. L. c. 151A, § 2).  Therefore, courts commonly look to contractual language as a starting point for assessing how a worker ought to be classified.  See, e.g., Subcontracting Concepts, Inc., supra at 647-648 (looking to plain terms of employment contract to assess contention that entity was not "employing unit" and did not require worker to submit to control or direction); Rogers vs. MIT Lincoln Lab., Mass. Superior Ct., No. 10-04587 (July 5, 2012) (in employment discrimination case, under G. L. c. 151B, employment and payment

structure established by agreement weighed in favor of finding that plaintiff was independent contractor); Rainbow Dev., LLC vs. Department of Indus. Accs., Mass. Superior Ct., No. 2005-00435 (Nov. 17, 2005) (examining written provisions of agreement to assess whether entity, despite classifying workers as independent contractors, asserted control over worker performance by way of contract).

Here, the agreement is replete with references to the plaintiffs' duties and responsibilities as a franchisee, and System4's liability, if any, could not be determined without reference to it.  See McBro Planning & Dev. Co. v. Triangle Elec. Constr. Co., 741 F.2d 342, 344 (11th Cir. 1984) (signatory equitably estopped from asserting that lack of written agreement precluded arbitration where basis of claim was breach of duties assigned under agreement that contained arbitration clause). While the terms of an employment contract are not, on their own, dispositive, see Commissioner of the Div. of Unemployment Assistance v. Town Taxi of Cape Cod, Inc., 68 Mass. App. Ct. 426, 430 n.9 (2007), the language employed may be a significant factor in evaluating the merits of a misclassification claim and making a "status determination."  Boston Bicycle Couriers, Inc. v. Deputy Director of the Div. of Employment & Training, 56 Mass. App. Ct. 473, 483-484 (2002).  Further, any determination as to whether the plaintiffs have satisfied the statutory

requirements of the Wage Act, and established their status as employees, ought to "be based upon a comprehensive analysis of the totality of relevant facts and circumstances of the working relationship." Id. at 484. While "[n]o one factor is outcome-determinative," id., it is fair to say that an important element of a working relationship is the contract responsible for creating it.

This is not a situation in which the franchise agreement is merely factually significant to the plaintiffs' claims or has a "but-for" relationship with them. See Lenox MacLaren Surgical Corp., 449 Fed. Appx. at 709. Contrast VSR Fin. Servs., Inc. v. McLendon, 409 S.W.3d 817, 832-833 (Tex. Ct. App. 2013) (plaintiff did not rely on terms of agreement in asserting claims where pleading only made reference to or presumed existence of agreement). Rather, the plaintiffs here must rely, in part, on the terms of the franchise agreements in asserting that the provisions are unenforceable and that they were mischaracterized as independent contractors. The plaintiffs cannot avoid arbitration with System4 when the issues System4 is seeking to resolve in arbitration are intertwined with the agreements that the plaintiffs signed.

b. Concerted misconduct. The plaintiffs have consistently alleged concerted misconduct by System4 and NECCS. See Sanders v. Swift Transp. Co. of Arizona, LLC, 843 F. Supp. 2d 1033,

1037-1038 (N.D. Cal. 2012) (nonsignatory could compel arbitration under equitable estoppel where concerted misconduct alleged between signatory and nonsignatory).  In assessing whether a plaintiff has advanced sufficient allegations of concerted misconduct, courts frequently look to the face of the complaint.  See Holden v. Deloitte & Touche LLP, 390 F. Supp. 2d 752, 768 (N.D. Ill. 2005).[17]

The plaintiffs have lumped the two defendants together, asserting each claim in their complaint against System4 and NECCS collectively.  See Amstar Mtge. Corp. v. Indian Gold, LLC, 517 F. Supp. 2d 889, 897 (S.D. Miss. 2007) (concerted misconduct prong met where action was "averred against all defendants" and complaint was "littered with references of substantially interdependent and concerted misconduct" by all defendants); Hagan vs. GreenPoint Credit Corp., U.S. Dist. Ct., No. 07-17-KKC (E.D. Ky. Aug. 3, 2007) (allegation of concerted misconduct demonstrated where plaintiffs collectively referred to all defendants in complaint as "the defendants").  Contrast Bailey v. ERG Enters., LP, 705 F.3d 1311, 1321 n.12 (11th Cir. 2013) (where plaintiffs only alleged misconduct against nonsignatory and did not name other signatory as party in complaint, second

---

[17] Some jurisdictions require allegations of "pre-arranged, collusive behavior" between the signatory and nonsignatory defendants in order to meet the concerted misconduct test.  See Donaldson Co. v. Burroughs Diesel, Inc., 581 F.3d 726, 734-735 (8th Cir. 2009) (citation omitted).

circumstance of equitable estoppel not implicated).  In addition, the plaintiffs have consistently charged both System4 and NECCS with equal wrongs, failing to distinguish them throughout the evolution of this case, thereby effectively asserting "interdependent and concerted misconduct" between them.  Grigson 210 F.3d at 257.  See Maldonado vs. Mattress Firm, Inc., U.S. Dist. Ct., No. 13-CV-292-T-33AEP (M.D. Fla. June 3, 2013) (equitable estoppel warranted to compel arbitration where signatory failed to distinguish among defendants in alleging claims).  For example, the plaintiffs allege that both defendants, "together," subjected them to "numerous misrepresentations" and "misclassified" them as independent contractors.  Additionally, the plaintiffs allege that "[t]he written contracts between Defendants and the plaintiffs . . . are unenforceable" and unconscionable (emphasis added).  There is not a single claim alleged against System4 or NECCS as a separate entity.  See Brown v. Pacific Life Ins. Co., 462 F.3d 384, 398-399 (5th Cir. 2006) ("[a]s the [plaintiffs] fail to allege tortious acts by [nonsignatories] that are separate and apart from [signatories], we can only conclude that the complaint asserts concerted misconduct by all parties").

In sum, because a decision maker must analyze the franchise agreements in assessing the merits of the plaintiffs' claims, and the plaintiffs have pointedly alleged concerted misconduct

between System4 and NECCS with respect to the agreements and their employment status thereunder, System4 can compel arbitration.

2. <u>Validity of arbitration clause</u>. a. <u>Wage Act claims</u>. Although System4 can compel arbitration despite being a nonsignatory, the plaintiffs further argue that their Wage Act claims are not arbitrable. Specifically, they ask us to extend our decision in <u>Crocker</u>, 464 Mass. at 14-15, and hold that the arbitration clause does not apply to their Wage Act claims given that it makes no explicit mention of such claims.[18] We decline to do so at this time.

The Wage Act provides, in relevant part: "[e]very person having employees in his service shall pay weekly or bi-weekly each such employee the wages earned by him to within six days of the termination of the pay period during which the wages were earned if employed for five or six days in a calendar week . . . . No person shall by a special contract with an employee or by any other means <u>exempt</u> himself from this section . . . ." (emphasis added). G. L. c. 149, § 148. "We have consistently held that the legislative purpose behind the Wage Act (and especially the 'special contract' language) is to provide strong

---

[18] That the agreement makes no mention of wage claims is of little surprise, as it classifies the plaintiffs as independent contractors.

statutory protection for employees and their right to wages." Crocker, 464 Mass. at 13.

In Crocker, we considered whether a general release of liability contained in a termination agreement barred Wage Act claims. See id. at 12-15. We held that, given the Wage Act's strong statutory protection for employees and their right to wages, as seen through its specific prohibition on exemption attempts, general releases fail to waive Wage Act claims unless they explicitly and clearly refer to such claims. Id. at 14-15. Crocker, although referencing our decision in Warfield, 454 Mass. at 398-402 (arbitration clause applies to gender discrimination claims only if clause specifically mentions such claims), was not a case concerning arbitration. Rather, our overarching concern was that if general releases applied to Wage Act claims, employees might find themselves "unwittingly waiv[ing] their rights under the Wage Act." Crocker, 464 Mass. at 14-15. This, of course, was particularly problematic given the Wage Act's specific prohibition of contractual waivers of its rights and protections. The "special contract" prohibition within the Wage Act was "intended to thwart . . . schemes" to avoid compliance. DiFiore v. American Airlines, Inc., 454 Mass. 486, 497 (2009).

The instant case is distinguishable, as arbitration agreements are not the equivalent of claim releases. See, e.g.,

<u>Barbieri</u> v. <u>K-Sea Transp. Corp</u>., 566 F. Supp. 2d. 187, 192 (E.D.N.Y. 2008) ("An agreement to arbitrate is not a release of any claim . . ."). An arbitration agreement, as opposed to a general release, does not permit an employer to thwart or exempt itself from Wage Act obligations, but solely dictates the forum in which the plaintiffs' right to recovery will be determined. Accordingly, here, the plaintiffs did not unwittingly relinquish their right to recovery under the Wage Act upon signing the franchise agreements.[19]

b. <u>Unconscionable provisions</u>. The plaintiffs additionally argue that the arbitration agreements are permeated with a series of unconscionable provisions which render them invalid under Massachusetts law. Specifically, the plaintiffs take issue with three aspects of the agreements: (1) a cost-splitting provision, (2) a shortened statute of limitations, and (3) a confidentiality provision. They argue that, taken together, these provisions ought to render the entire agreement unenforceable.

As an initial matter, we note that not all of these provisions are unconscionable. "The determination that a

---

[19] Even if Massachusetts law did require an arbitration clause to specifically mention applicability to claims under the Wage Act, "such a principle" might be "preempted by the [Federal Arbitration Act]," <u>Awuah</u> v. <u>Coverall N. Am., Inc.</u>, 703 F.3d 36, 45 (1st Cir. 2012), as it could be interpreted to prohibit or disproportionately disfavor arbitration. See <u>AT&T Mobility LLC</u> v. <u>Concepcion</u>, 131 S. Ct. 1740, 1747 (2011).

contract or term is or is not unconscionable is made in the

light of its setting, purpose and effect" (quotation omitted).

Miller, 448 Mass. at 679.  Under Massachusetts law, "[t]o prove

that the terms of a contract are unconscionable, a plaintiff

must show both substantive unconscionability (that the terms are

oppressive to one party) and procedural unconscionability (that

the circumstances surrounding the formation of the contract show

that the aggrieved party had no meaningful choice and was

subject to unfair surprise)."  Storie vs. Household Int'l, Inc.,

U.S. Dist. Ct., No. 03-40268 (D. Mass. Sept. 22, 2005), citing

Zapatha v. Dairy Mart, Inc., 381 Mass. 284, 293 n.13 (1980).

As for cost-splitting,[20] we made clear in Machado I that the

mandates of the Wage Act would override this provision if the

plaintiffs were successful in arbitration.  See 465 Mass. at

516-517.  See also Awuah v. Coverall N. Am., Inc., 791 F. Supp.

2d. 284, 287-288, 290-291 (D. Mass. 2011) (recognizing award of

attorney's fees and costs to prevailing plaintiff is mandatory

under Wage Act and awarding over $37,000 in fees and costs on

individual arbitration awards of approximately $1,600 and

$5,700).  Accordingly, given that the arbitrator would be bound

---

[20] The agreement mandates that arbitration take place in accordance with the commercial arbitration rules of the American Arbitration Association (AAA rules).  Rule 54 of the AAA rules provides that most arbitration costs "shall be borne equally by the parties, unless they agree otherwise or unless the arbitrator in the award assesses such expenses or any part thereof against any specified party or parties."

to award the plaintiffs, on prevailing, both the costs of their action as well as reasonable attorney's fees, this provision of the agreement is enforceable.

The agreement additionally provides for a one year or eighteen-month statute of limitations, which is shorter than the three-year period provided by G. L. c. 149 § 150. Massachusetts law permits contractually shortened limitations periods so long as they are "reasonable" and "not contrary to other statutory provisions or to public policy." Creative Playthings Franchising, Corp. v. Reiser, 463 Mass. 758, 760-761 (2012) (holding contractual limitations period shortening time within which claims must be brought from six years to one year or eighteen months was valid and enforceable under Massachusetts law). "[W]e have long allowed the limitations period within which a claim arising from a contract may be brought to be shortened by contractual agreement." Id. at 759. The plaintiffs have presented no evidence to suggest that the shortened statute of limitations at issue is unreasonable or contrary to public policy. Accordingly, it remains enforceable.

Finally, the plaintiff cites to cases in other jurisdictions in which confidentiality provisions have been deemed unconscionable because they may prevent potential plaintiffs from building similar cases against defendants. Courts have distinguished their own holdings on this issue based

on the size of the putative class. Compare Ting v. AT&T, 319 F.3d 1126, 1151-1152 (9th Cir.), cert. denied, 540 U.S. 811 (2003) (confidentiality provision held substantively unconscionable when applied to large class of customers), with Kilgore v. KeyBank, Nat'l Ass'n, 718 F.3d 1052, 1059 n.9 (9th Cir. 2013) ("small number of putative class members . . . mitigates" confidentiality provision concerns). Essentially, if the subject of arbitration is a contract that affects millions of people, the likelihood of future cases is increased. In such a scenario, the unavailability of an arbitral decision will deny these potential plaintiffs with access to precedent, thereby putting the defendant "in a far superior legal posture." Ting, 319 F.3d at 1152. Here, while a motion for class certification has yet to be filed, the putative class consists of franchisees, a relatively small and known quantity of individuals. Any gains System4 might gather from the typical "repeat player" effect are therefore diminished. This factual element is distinct from cases involving a large and unknowable class of customers. Most importantly, however, "the enforceability of the confidentiality clause is a matter distinct from the enforceability of the arbitration clause in general." Kilgore, 718 F.3d at 1059 n.9. The plaintiffs would still be "free to argue during arbitration that the confidentiality clause is not enforceable." Id.

Nevertheless, even if we were to find any of the discussed provisions unconscionable, the franchise agreements contain a severability clause, requiring any unenforceable term to be severed.  This is not the type of case in which "illegality pervades the arbitration agreement," Booker v. Robert Half Int'l, Inc., 413 F.3d 77, 84-85 (D.C. Cir. 2005), nor are the arbitration provisions "so one-sided that their only possible purpose is to undermine the neutrality of the proceeding" (emphasis added; citations omitted).  Nino v. Jewelry Exch., Inc., 609 F.3d 191, 207-208 (3d Cir. 2010) (arbitration agreement unconscionable where employer permitted to strike more members of arbitration panel than employee, employee must give notice of claims he intends to arbitrate while employer is under no such obligation, and employee must file grievance within five days of underlying events or lose right to arbitration).  We are unconvinced that the contested provisions equate to such a level of unconscionability that the arbitration clause should not be enforced.  Not only do the franchise agreements contain a severability clause, but also the plaintiffs identify only one potentially unenforceable provision (confidentiality), which "does not infect the arbitration clause as a whole."  Booker, 413 F.3d at 85.

Last, "[f]or agreements governed by the FAA, the statute's presumption of arbitrability means that 'in applying general

state-law principles of contract interpretation to the interpretation of an arbitration agreement . . . due regard must be given to the federal policy favoring arbitration, and ambiguities . . . resolved in favor of arbitration.'" Joulé, Inc., 459 Mass. at 94, quoting Volt Info. Sciences, Inc. v. Trustees of Leland Stanford Jr. Univ., 489 U.S. 468, 475-476 (1989).  Given this strong public policy in conjunction with our holdings on the plaintiffs' Wage Act and unconscionability claims, we conclude that the arbitration clause at issue remains valid.

Conclusion.  The denial of the plaintiffs' motion for a ruling that System4's arbitration clause is unconscionable and cannot apply to wage claims in light of Crocker is affirmed. The grant of the plaintiffs' motion for a ruling that the arbitration clause cannot be enforced by System4 is reversed. The case is hereby remanded to the Superior Court for further proceedings consistent with this opinion.

So ordered.