NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

25-P-616

CHARLES KIM

vs.

SYK BIOSCIENCES LLC & others.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The plaintiff, Dr. Charles Kim, appeals from a Superior Court judgment dismissing his eight-count complaint on the ground that the forum selection clauses (FSCs) in his employment agreements with the defendants SYK Biosciences LLC (SYK) and Pulsethera, Inc. (P-Inc.) require the case to be filed in Delaware. On appeal, Kim argues that the FSCs do not apply to all of his claims or to those defendants who are not parties to his agreements with SYK and P-Inc. We vacate so much of the judgment as dismissed Kim's Massachusetts statutory claims, but we otherwise affirm the judgment.

_____

[1] Pulsethera Corp., Pulsethera, Inc., Leon Frances Hebert, Jr., Michael Mansour, Ji-Xin Cheng, and Steven Qian.

Background.  We recite certain essential facts as alleged in Kim's verified first amended complaint (the operative complaint).  Kim is a chemist and scientist living in Boston.  The defendant SYK was a startup biotechnology company that operated in Boston until its dissolution in 2023, and the defendants Leon F. Hebert, Jr., and Michael Mansour are Massachusetts residents who are principals of SYK and who exercised significant managerial control over SYK at all relevant times.  The defendants P-Inc. and Pulsethera Corp. (P-Corp.) are startup medical device companies based in Boston.  The defendants Ji-Xin Cheng and Steven Qian are Massachusetts residents who, along with Hebert and Mansour, are principals of P-Corp. and exercised significant managerial control over P-Corp. at all relevant times.  The complaint often refers to P-Inc. and P-Corp. collectively and interchangeably as "Pulsethera," and we do the same, except where necessary to distinguish one from the other.

1.  SYK agreement.  On December 8, 2021, Kim signed a "consulting agreement" with SYK to work as a scientist.  The SYK agreement was for a term of twelve months, "unless there is an earlier termination or extension as provided herein," but it did not include any further provision regarding extensions.  The SYK agreement provided for payment to Kim at a rate of $200 per hour

2

plus expenses, contained an acknowledgment that he was an independent contractor, and included a Delaware choice of law clause and an FSC providing that "any dispute under this [a]greement that cannot be settled by the [p]arties shall be decided in the [F]ederal or a [S]tate court of the State of Delaware."

In November 2022, Kim reminded Hebert that the SYK agreement would be expiring soon and requested an extension. Hebert stated that he would send paperwork to extend the agreement, but he did not do so. Kim alleges that the SYK agreement expired on December 8, 2022. Later that December, Kim again asked Hebert to extend the SYK agreement, and to backdate the extension to account for work Kim had done since the expiration. Once again, Hebert did not do so, and so in February 2023, Kim asked Hebert and Mansour to "sign a follow-on contract for SYK that covers work from December 9, 2022 and onward. This would cover the work we've been doing to prepare formulations for the baboon studies." Once again, no extension paperwork was sent. At least as to the work he performed in December 2022, Kim alleges that he made the "reasonable assumption that his work for the [d]efendant companies would be paid at the rate of $200 per hour, as provided by, inter alia, the [a]greements." Further, SYK, Hebert, and Mansour knew that

3

Kim continued to perform work for SYK following the agreement's expiration date.

SYK did not pay Kim for the work he did between November 2022 and February 2023 -- including thirty-seven hours before the asserted expiration date and fifty-nine and one-half hours after that date -- and did not reimburse him for a software expense he incurred after the expiration date. In an exchange of electronic mail messages in February and March 2023, Hebert acknowledged the delay in paying Kim "the amount due," and stated that he (Hebert) would speak or had spoken to his investor in an effort to obtain payment to Kim, but the payments were never made.

2. P-Inc. agreement. In the meantime, on September 23, 2022, after discussions with Hebert and Mansour, Kim had signed an agreement with P-Inc. to work as a scientist, on terms essentially identical to those in the SYK agreement. The P-Inc. agreement also included a choice of law clause and an FSC identical to those in the SYK agreement. Despite P-Inc.'s being the agreement's signatory, Kim alleges that he was working for both P-Inc. and P-Corp. -- i.e., that they were his "joint employers" -- because the sole payment he received from either entity was from P-Corp. He asserts that the two entities were indifferent to maintaining any material distinction between

4

themselves.  Kim received no payment for the work he performed for Pulsethera from December 7-31, 2022.

3.  The claims.  The operative complaint asserted eight claims, four of which were asserted against all defendants. Count one claimed that Kim was an employee but was misclassified as an independent contractor in violation of G. L. c. 149, § 148B.  Count two claimed violations of the Wage Act, G. L. c. 149, § 148.  Count three asserted a quantum meruit claim and count four asserted an unjust enrichment claim; both counts focused on the defendants' failure to pay Kim for the work he performed.

Of the remaining claims, count five asserted that Pulsethera, Hebert, and Mansour, despite never intending to pay Kim for work he would do for Pulsethera, fraudulently induced Kim to enter the P-Inc. agreement and to perform such work. Count six asserted that SYK, Pulsethera, Hebert, and Mansour, while both agreements were in effect, made false and misleading statements to Kim regarding their intention to pay him for the work he was doing for SYK and Pulsethera.  Count seven asserted a promissory estoppel claim against SYK, Pulsethera, Hebert, and Mansour, alleging that Kim performed work for them in reasonable reliance on their promises to pay him.  Finally, count eight asserted a conspiracy claim against all defendants, alleging an

5

unlawful combination to (among other things) obtain Kim's work without paying him.  Notably, Kim did not assert any breach of contract claims.[2]

On the defendants' motion to dismiss under Mass. R. Civ. P. 12 (b) (6), 365 Mass. 754 (1974), based on the Delaware forum selection clauses in the SYK and P-Inc. agreements, a judge dismissed all claims against all defendants.  Kim now appeals.

Discussion.  In an appeal of a judgment dismissing a complaint based on an FSC, "we take the facts alleged in the complaint to be true and draw all reasonable inferences favorable to the plaintiff."  Boland v. George S. May Int'l Co., 81 Mass. App. Ct. 817, 818 n.4 (2012).  We review the dismissal de novo.  See Casavant v. Norwegian Cruise Line, Ltd., 63 Mass. App. Ct. 785, 792-793 (2005), cert. denied, 546 U.S. 1173 (2006).  This case turns largely on the interpretation of the FSCs.  Under the agreements' Delaware choice of law clauses, Delaware law generally controls the interpretation of the FSCs. See Jacobson v. Mailboxes Etc. U.S.A., Inc., 419 Mass. 572, 575

---

[2] Although we do not rely on the point, Kim's unexplained decision not to assert these seemingly available and straightforwardly applicable claims (for uncompensated work during the term of the contracts) raises concerns of inappropriate "artful pleading" that should not be allowed to defeat an FSC (quotation and citation omitted).  Ashall Homes Ltd. v. ROK Entertainment Group Inc., 992 A.2d 1239, 1252 n.33 (Del. Ch. 2010)

6

(1995) (considering enforceability, effect, and construction of FSC in light of law of jurisdiction specified in choice of law clause).  See also Ashall Homes Ltd. v. ROK Entertainment Group Inc., 992 A.2d 1239, 1245 (Del. Ch. 2010).  Yet the parties do not point to any significant, settled difference between how Delaware and Massachusetts interpret FSCs, and the parties cite a mixture of Delaware and Massachusetts cases in support of their various arguments.  We will do the same.

Kim raises three main arguments:  (1) the FSCs do not apply to the claims against SYK for work done after what Kim argues was the expiration of the SYK agreement; (2) the FSCs cannot be enforced by those defendants who are not parties to his contracts with SYK or P-Inc; and (3) it was error to dismiss the entire complaint where the FSCs applied only to some claims against some defendants.[3]  Significantly, however, Kim's third argument, after incorporating his first two arguments, asserts only that his claims for misclassification and nonpayment of wages "are statutory in nature and exist independently of the contract terms" and thus are not covered by the FSCs.  We choose to address that last point first.

---

[3] Kim also makes a fourth argument:  that enforcing the FSCs as to the Wage Act claims would violate Massachusetts public policy.  Because we conclude infra that the FSCs do not apply to the Wage Act claims in any event, we need not and do not reach the public policy argument.

7

1. _Statutory claims_.  Counts one and two allege violations of the independent contractor statute, G. L. c. 149, § 148B, and the Wage Act, G. L. c. 149, § 148.  We are not persuaded that either of these claims is subject to the FSCs.  We begin by recognizing that the FSCs here are quite narrow, applying only to "any dispute under" the agreements.  This contrasts with cases in which an FSC applied to, for example, "any and all disputes arising out of this [a]greement or the employment relationship created thereby," _Melia_ v. _Zenhire, Inc_., 462 Mass. 164, 166 (2012); "[a]ny dispute arising out of or concerning" an agreement, _Baby Furniture Warehouse Store, Inc_. v. _Meubles D & F Ltee_, 75 Mass. App. Ct. 27, 28 (2009); or "any and all claims, disputes or controversies whatsoever arising from or in connection with this [c]ontract and the transportation furnished hereunder," _Casavant_, 63 Mass. App. Ct. at 788 n.7.  See _Ingres Corp_. v. _CA, Inc_., 8 A.3d 1143, 1145 (Del. 2010) (FSC applied to "any action or proceeding in respect of any claim directly arising out of or related to this [a]greement, whether in tort or contract or at law or in equity" [emphasis omitted]).  We interpret the FSCs according to their terms.  See _Baby Furniture Warehouse Store, Inc_., _supra_ at 30.

a.  _Misclassification claims_.  Under G. L. c. 149, § 148B, a worker has a right to be treated as an employee, unless the

8

worker's performance of services meets the independent contractor criteria set forth in that statute.  This is a right arising under the statute, not under the agreement for services.  Although "contractual language" may be "a starting point for assessing how a worker ought to be classified," it is not controlling.  Machado v. System4 LLC, 471 Mass. 204, 214 (2015).  Here, the SYK and P-Inc. agreements provide that Kim was an independent contractor.  Thus Kim's statutory claim to being an employee, far from being "under" or governed by the agreements, is a dispute over whether the statute supersedes the agreements.  We are aware that a misclassification dispute may fall within a broadly worded arbitration clause like the one at issue in Machado, which encompassed any claims "arising out of or related to . . . the franchise agreement . . . [the franchisor's] relationship with the franchisee, or . . . the operation of the franchised business."  Id. at 206.  See generally National Indus. Group v. Carlyle, 67 A.3d 373, 384 n.41 (Del. 2013) (arbitration clause is analogous to FSC).  Here, however, the FSCs are far narrower, and the misclassification dispute raised by count one does not fall "under" the agreements.

b.  Wage Act claims.  We reach the same conclusion regarding the Wage Act claims of count two, through which Kim asserts rights not under the agreements but instead under G. L.

9

c. 149, § 148.  Although his right to receive compensation itself may arise under the agreements, his right under the Wage Act involves a different right:  the right to _timely_ receipt of compensation.  The statute "generally requires that all public and private employers in the Commonwealth pay their employees' wages no more than seven days after the end of the pay period in which the wages were earned."  Parris v. Sheriff of Suffolk County, 93 Mass. App. Ct. 864, 864-865 (2018).  "The purpose of G. L. c. 149, § 148, is to prevent the evil of the 'unreasonable detention of wages [by employers]'" (citations omitted).  Id. at 867.  The "statute creates an independent statutory right that can be enforced judicially even when a collective bargaining agreement addresses the subject matter of compensation" (citation omitted), id. at 869, and even when that agreement contains a grievance and arbitration clause, id. at 870-871 & n.10.  We think that similar logic extends to an FSC that narrowly applies to disputes "under" an agreement.  See National Indus. Group, 67 A.3d 373, 384 n.41.  The FSC governs claims to enforce the payment provision of the agreement, but it does not govern claims to enforce the prompt payment provision of the statute.[4]

---

[4] The result might be different if the FSC were phrased more broadly to include Wage Act claims, as cases from the analogous arbitration clause context suggest.  See Machado, 471 Mass. at

10

Here, moreover, the Wage Act and the agreements conflict. The Wage Act generally requires payment within seven days, whereas both the SYK and P-Inc. agreements specify that Kim "will be paid monthly in arrears, payable within thirty (30) days of submission of appropriate invoices." Kim's Wage Act claim plainly falls "under" the Wage Act. Importantly, that statute includes an anti-waiver provision, stating that "[n]o person shall by a special contract with an employee or by any other means exempt himself from this section." G. L. c. 149, § 148, sixth par. "[W]aiver of Wage Act protections is strongly disfavored." Parris, 93 Mass. App. Ct. at 867. Therefore, Kim's Wage Act claim, much like his misclassification claim, is not one "under" the agreements; rather, it involves a dispute over whether the statute's requirements supersede the agreements.

Because we conclude that the FSCs do not apply to Kim's two statutory claims in any event, we need not address the extent to which, as to those claims, the FSCs may be enforced by non-

206, 216-218 (Wage Act claims arbitrable under clause mandating arbitration of "virtually all claims arising out of the franchise relationship"); Dixon v. Perry & Slesnick, P.C., 75 Mass. App. Ct. 271, 271-272 (2009) (arbitration clause applicable to "[a]ll disagreements and controversies arising with respect to this [a]greement, or with respect to its application to circumstances not clearly set forth in this [a]greement" includes Wage Act claim).

11

parties to the agreements, or enforced with respect to the time after the claimed expiration of the SYK agreement. Rather, insofar as the judgment dismissed the statutory claims (counts one and two), we vacate the judgment as to all defendants and time periods.

2. Work performed after SYK agreement's expiration. Kim alleges that SYK failed to pay him for the work he performed from November 8, 2022, through February 7, 2023, which includes thirty-seven hours of work before, and fifty-nine and one-half hours of work after, what he asserts was the SYK agreement's expiration date, December 8, 2022. Notably, however, none of the six remaining claims[5] pleaded in the complaint differentiates between the two time periods or purports to apply to one period but not the other.[6] Kim nevertheless argues that, even if that

---

[5] We exclude from this discussion the two statutory claims, which we have concluded are not subject to the FSCs.

[6] Kim's brief hints that his quantum meruit and unjust enrichment claims "are premised on the absence of an explicit contract." To the extent he means that those claims apply only to that period after the asserted expiration of the SYK agreement, and are thus wholly outside of the FSC, Delaware law appears to be to the contrary. See Ashall Homes Ltd., 992 A.2d at 1252 (although contract's FSC was limited to claims "arising hereunder," court interpreted it as also applying to "claims not based on the contract containing the clause if those claims grow out of the contractual relationship" [quotation and citation omitted]). Where SYK failed to pay Kim for the work done just before the agreement's asserted expiration, and then continued not to pay Kim for apparently related work done just after that expiration, we think the Delaware courts would treat even those

12

portion of each claim seeking recovery for work done before the agreement's asserted expiration is subject to the FSC, the portion of each claim seeking recovery for work done after the agreement's expiration is not, precisely because the agreement, including its FSC, was no longer in effect.

We are not persuaded that the claims can be sliced so thinly. The FSC applies not merely to claims but to "any dispute under" the SYK agreement (emphasis added). Here, although Kim's complaint asserts the legal conclusion that the SYK agreement had expired, some of his factual allegations suggest the existence of a dispute over that issue. Specifically, the complaint alleges that Kim asked Hebert to extend the agreement, to which Hebert replied that he would send paperwork to do so (although Hebert failed to follow through). The complaint alleges that even after the asserted expiration date, Kim continued to work, making the "reasonable assumption that his work . . . would be paid at the rate of $200 per hour, as provided by, inter alia, the [a]greements." The complaint alleges that the defendants knew Kim was continuing to work and that Kim continued to request an extension, backdated to cover the work he had done since the asserted expiration. Hebert

_____

claims or theories applicable solely to post-expiration work as claims "grow[ing] out of the contractual relationship." Id.

13

assured Kim that he (Hebert) was working to "transfer the amount due" to Kim.

More significantly, the defendants, too, suggest a dispute regarding whether the agreement expired. In response to what the defendants purport to construe as Kim's allegation that Hebert "verbally agreed to extend [the] contract," the defendants concede that SYK's actions of "accepting work following November 8, 2022 and receiving the monthly reports that were alleged to have been sent by [Kim]"[7] can be viewed as an implicit waiver of the agreement's "written terms regarding extension."[8] Regardless of whether the defendants' interpretation of Kim's position is reasonable, we take the defendants at their word as to their own position: despite the absence of a written extension, they view the SYK agreement as having been extended to cover the period after December 8, 2022, in which Kim alleges he performed work for SYK but was not paid.

---

[7] We construe this as referring to the complaint's allegation that "Kim provided written, monthly reporting of his hours worked and expense incurred on SYK Biosciences' behalf in a timely fashion."

[8] As discussed earlier, the SYK agreement was for a term of twelve months, "unless there is an earlier termination or extension as provided herein," but it did not include any further provision regarding extensions. The agreement also provided that any amendment thereto, or any waiver of any provision thereof, must be in writing.

14

The defendants have deliberately and repeatedly made this and similar assertions in order to support their argument that the SYK agreement, including its FSC, remained in effect.[9]  Because Kim, in contrast, asserts that the agreement expired, there is a "dispute under th[e] [a]greement" about whether it remained in effect, and that dispute is subject to the FSC.  See Ashall Homes Ltd., 992 A.2d at 1247 ("interpretation of the [agreements'] termination provision and application of the doctrine of contractual waiver are issues for the court identified in the [FSC] to decide").  Otherwise put, we rely on the defendants' characterization of their position as evincing a dispute under the agreement, to which we conclude the FSC applies, and we expect the defendants to adhere to that position

---

[9] Their brief portrays Hebert's statement that he would send extension paperwork as "apparently verbally agree[ing] to extend the contract," and as "implying a verbal agreement to extend the [a]greement."  Kim suggests that, because the defendants did not take this position in the Superior Court, they may not do so on appeal.  See Carey v. New England Organ Bank, 446 Mass. 270, 285 (2006).  That rule, however, applies to "issues not raised by a losing party in the trial court" (emphasis added).  Adoption of Mary, 414 Mass. 705, 712 (1993).  "It is well established that, on appeal, we may consider any ground apparent on the record that supports the result reached in the lower court" (emphasis added).  Gabbidon v. King, 414 Mass. 685, 686 (1993).  Although we take the complaint's factual allegations as true and draw all reasonable inferences therefrom in Kim's favor, see Boland, 81 Mass. App. Ct. at 818 n.4, his assertion that the agreement terminated is a conclusion of law, which we are not bound to accept, particularly where the defendants assert otherwise.

15

if Kim commences litigation in Delaware.  See <u>Bay State Gas Co.</u>
v. <u>Department of Pub. Utils</u>., 459 Mass. 807, 818 (2011)
(discussing judicial estoppel).

Although Kim cites other cases holding an FSC inapplicable
to claims arising after termination of the relevant contract,
those cases do not govern here.  Even putting aside that the
FSCs in those cases were worded differently than the SYK FSC,
none of those cases involved a dispute over whether the contract
was in effect at the time the claims arose.[10]  See, e.g., <u>In re</u>
<u>AstroPower Liquidating Trust</u>, 335 B.R. 309, 328 (Bankr. D. Del.
2005); Bay State Anesthesia, Inc. <u>vs</u>. Mallinckrodt, Inc., U.S.
Dist. Ct., No. CIV.A. 02-11174RWZ (D. Mass. Dec. 6, 2002);
Mobilificio San Giacomo S.p.A <u>vs</u>. Stoffi, U.S. Dist. Ct., No.
C.A. 96-415-SLR (D. Del. Jan. 29, 1998).

Moreover, none of those cases involved, let alone approved,
the approach that Kim asks us to adopt here:  to divide a single
claim into pretermination and posttermination segments, so that,
notwithstanding an FSC's applicability to the pretermination
segment, at least the posttermination segment could be litigated
instead in the plaintiff's chosen forum.  To be sure, where

---

[10] The same is true of the cases cited by Kim holding an FSC
inapplicable to claims arising <u>before</u> the formation of the
relevant contract.  See, e.g., Bulwer <u>vs</u>. EchoNous, Inc., U.S.
Dist. Ct., No. 23-CV-11097-ADB (D. Mass. Mar. 29, 2024).

16

"[t]he greater focus of [a] plaintiff['s] claims" is on conduct preceding the term of a contract containing an FSC, a "judge should not enforce the [FSC] by banishing contract enforcement claims to [the specified forum] for separate treatment." Jacobson v. Mailboxes Etc. U.S.A., Inc., 419 Mass. 572, 579 (1995).[11]  But in Jacobson, the precontractual claims were based on different legal theories than the contractual claims, i.e., "precontract misrepresentations and for fraud in the inducement" as distinct from "claims of breach of contract and their tort-related alter egos."[12]  Id. at 578, 579.  Jacobson did not approve splitting a single contract-related claim based on a single legal theory (e.g., fraud, or promissory estoppel) into two segments according to whether the monetary injury occurred during or after the contract term and then deciding, based on the relative amounts of time or money at issue, which segment was the "greater focus" for purposes of determining whether to

_____

[11] We assume arguendo that Jacobson could also apply to a case in which various claims arose either during or after the term of a contract, and, in order to decide whether an FSC governed where the case as a whole should be litigated, a court might be called on to determine which set of claims was the greater focus of the complaint.

[12] At oral argument Kim disclaimed the position that his fraudulent inducement claim arose prior to the formation of the agreements and therefore was not governed by the FSCs.

17

enforce an FSC as to part or all of the claim.[13]  Id. at 579.  We have found no decision extending Jacobson to produce the result Kim seeks, and we decline to do so ourselves.

3.  Claims asserted against nonparties.  Kim contends that the FSCs are not enforceable by those defendants who are not parties to the agreements, and thus that his claims against those defendants should not have been dismissed.  Under Delaware law, however, a nonsignatory to an agreement that includes an FSC may enforce the FSC if the nonsignatory is "closely related to one of the signatories such that the non-party's enforcement of the clause is foreseeable by virtue of the relationship between the signatory and the party sought to be bound" (citation omitted).[14]  Ashall Homes Ltd., 992 A.2d at 1249.  The

---

[13] Such a determination might require extensive preliminary litigation that could undermine the purpose of the FSC.

[14] Kim suggests that Massachusetts law is to the contrary; he relies on a decision stating, "We have found no Massachusetts case enforcing a forum selection clause or a limitations clause against a nonsignatory to the contract."  Ajemian v. Yahoo!, Inc., 83 Mass. App. Ct. 565, 577 (2013), S.C., 478 Mass. 169 (2017), cert. denied sub nom. Oath Holdings, Inc. v. Ajemian, 584 U.S. 910 (2018).  The statement is only marginally relevant because here, nonsignatories are enforcing the FSC against the signatory, Kim -- not the converse.  Moreover, Kim's brief omits the very next sentence of Ajemian, which stated:  "However, courts in other jurisdictions have generally accepted that nonsignatory third parties can be bound where the nonparty is sufficiently closely related to a signatory that it is foreseeable that the nonsignatory will be bound."  Ajemian, supra at 577.  Cf. Landry v. Transworld Sys. Inc., 485 Mass. 334, 339 (2020) (acknowledging "six theories under which a

18

foreseeability analysis has been applied to the precise circumstance presented here: "when non-signatory defendants sought to enforce [an FSC], and the signatory plaintiffs sought to avoid it by arguing the non-signatory defendants lacked standing under the contract." Sustainability Partners LLC vs. Jacobs, Del. Ch., No. CV 2019-0742-SG (June 11, 2020). Thus we reject Kim's argument.[15]

We first address whether the defendant P-Corp. may enforce the FSC contained in the agreement signed by P-Inc. Kim himself alleges a close relationship between the two entities. He asserts that when Hebert and Mansour asked him to work for "Pulsethera," they "did not draw any distinction between [P-Corp.] and [P-Inc.]; instead, they referenced 'Pulsethera.'" Kim does the same throughout his complaint. He further asserts that he was working for both P-Inc. and P-Corp. -- i.e., that they were his "joint employers" -- because the sole payment he received from either entity was from P-Corp. He points to the

_____

nonsignatory may enforce a contract, such as an arbitration agreement, against a signatory").

[15] In arguing to the contrary, Kim mistakenly relies on a separate passage of Sustainability Partners LLC, under which a nonsignatory who receives a "direct benefit" from an agreement may be bound by the agreement's FSC. See Sustainability Partners LLC, supra. The foreseeability and direct benefit analyses are distinct, and either one may support application of an FSC to a nonsignatory. See id.

19

"apparent indifference shown by the Pulsethera entities in maintaining any material distinction between themselves." In these circumstances, it was entirely foreseeable to Kim that, in the event he sued P-Corp. on claims related to his agreement with P-Inc., P-Corp. would seek to invoke the FSC. See Ashall Homes Ltd., 992 A.2d at 1249. P-Corp. may thus enforce the FSC.

Next we address the individual defendants. Hebert and Mansour are alleged to be principals of and to have exercised significant managerial control over SYK. Hebert, Mansour, Cheng, and Qian are alleged to be principals of and to have exercised significant managerial control over P-Corp. Further, under the heading, "Individual Defendants Not Entitled to Protection of Corporate Veil," Kim alleges that:

> "there has been a confused intermingling of activity of [P-Corp.], [P-Inc.], and SYK Biosciences, for the purposes of engaging in a common fraudulent enterprise with substantial disregard of the separate nature of the corporate entities, or at least serious ambiguity about the manner and capacity in which these corporations and their respective representatives are acting" (emphasis added).

Once again, in light of these allegations, it was entirely foreseeable to Kim that, in the event he sued any of the four individual defendants on claims related to his agreements with SYK or P-Inc., those individuals would seek to invoke the FSCs. This case is much like Ashall Homes Ltd., where corporate officers and directors, sued for their actions related to an

20

agreement entered by the corporation and containing an FSC, were entitled to enforce that FSC.  See Ashall Homes Ltd., 992 A.2d at 1249.  Accordingly, the individual defendants here may enforce the FSCs.[16]

Conclusion.  We vacate so much of the judgment as dismissed counts one and two of the verified first amended complaint, and we remand the case for further proceedings on those counts.  The judgment is otherwise affirmed.

So ordered.

By the Court (Sacks,
  Hodgens & Toone, JJ.[17]),

Clerk

Entered:  April 15, 2026.

---

[16] In arguing that the individual defendants' status as principals of signatories is insufficient to allow them to enforce the FSCs, Kim errs in relying on Golden vs. ShootProof Holdings, LP, Del. Ch., No. 2022-0434-MTZ (Feb. 28, 2023). There, a plaintiff, invoking a foreseeability theory, sought to enforce an FSC against defendant LLC officers who were nonsignatories to the defendant LLC's agreement with the plaintiff. Id.  The court refused. Id., reasoning in part that the case was not within the rule that foreseeability could support FSC enforcement "where a nonsignatory defendant seeks to enforce [an FSC] against a signatory plaintiff" (emphasis added).  See Sustainability Partners LLC, Del. Ch., No. CV 2019-0742-SG (June 11, 2020).  Kim's case, in contrast, fits squarely within that rule.

[17] The panelists are listed in order of seniority.

21